SUPREME JUDICIAL COURT 
 
 KATHLEEN VITA[1] vs. NEW ENGLAND BAPTIST HOSPITAL (and a consolidated case[2])

 
 Docket:
 SJC-13542
 
 
 Dates:
 April 3, 2024 - October 24, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Electronic Surveillance. Hospital. Internet. Statute, Construction. Practice, Civil, Standing, Motion to dismiss. Words, "Communication," "Interception."
 
 

       Civil actions commenced in the Superior
Court Department on February 24 and April 7, 2023.
      Motions to dismiss were heard by Hélène
Kazanjian, J., and the cases were reported by her to the Appeals Court.
      The Supreme Judicial Court granted an
application for direct appellate review.
      David Quinn Gacioch (Annabel Rodriguez
also present) for the defendants.
      Patrick J. Vallely (Edward F. Haber &
Michelle H. Blauner also present) for the plaintiff.
      The following submitted briefs for amici
curiae:
      J. Tucker Merrigan, Victoria Santoro Mair,
Ryan M. Hawkins, Ryan P. McManus, Dylan S. O'Sullivan, & Justin Kenney for
John Doe & others.
      John Pagliaro & Daniel B. Winslow for
New England Legal Foundation & another.
      Michael J. Tuteur, Lawrence W. Vernaglia,
& Morgan McDonald for Massachusetts Health and Hospital Association, Inc.,
& another.
      John Roddy & Elizabeth Ryan for
National Consumer Law Center, Inc., & another.
      Michael Vatis, of New York, & Michael
J. Mozes for National Retail Federation & another.
      Emily Johnson Henn, of California, Mark W.
Mosier, of the District of Columbia, Geoffrey Hobart, & Michael W. Maya for
Chamber of Commerce of the United States of America. 
      Elka T. Sachs, Ian D. Roffman, Seth P.
Berman, Natalie M. Cappellazzo, & Natalia Peña for Greater Boston Chamber
of Commerce & another.
      Robert Kingsley Smith, Neal Quenzer, &
Tobi Henzer for Pioneer Public Interest Law Center.
      KAFKER, J. 
The plaintiff, Kathleen Vita, alleges that the defendants, New England
Baptist Hospital (NEBH) and Beth Israel Deaconess Medical Center, Inc. (BIDMC)
(collectively, hospitals), violated G. L. c. 272, § 99 (wiretap act or
act), by collecting and transmitting her browsing activities on the hospitals'
websites.  In particular, her complaints
against the defendants allege that she accessed and reviewed information
available to the public on the hospitals' websites regarding doctors (including
their credentials and backgrounds) and medical symptoms, conditions, and
procedures, and that these interactions with the websites fall within the
meaning of "wire communication[s]" protected by the wiretap act.  Where the hospitals allegedly shared
information regarding Vita's browsing with third parties for advertising
purposes without her consent, Vita alleges the hospitals violated the wiretap
act by "intercept[ing]" her communications.  Vita does not allege that private patient
records or messages to nurses, doctors, or other healthcare providers were
intercepted.  
      Based on our review of the text of the
wiretap act and its legislative history, we cannot conclude with any confidence
that the Legislature intended "communication" to extend so broadly as
to criminalize the interception of web browsing and other such
interactions.  When the statute was
enacted, wiretaps involved the interception of person-to-person conversations
and messages using hidden electronic surveillance devices placed in people's
homes or businesses or tapping their telephone lines.  See Commonwealth v. Rainey, 491 Mass. 632,
645 (2023) (Legislature's chief concern in enacting wiretap act was
"electronic eavesdropping" and wiretapping [citation omitted]).  The Legislature crafted the statute to
prohibit new and evolving technological means of secret electronic
eavesdropping on such person-to-person conversations or messaging, whether they
be face-to-face conversations, calls on a landline telephone, cell phone calls,
text messages, Internet chats with other people, e‑mail messages, or other
interpersonal conversations or messaging utilizing future technology.  However, Vita's allegations do not claim the
interception of person-to-person conversations or messaging of the kind clearly
within the wiretap act's ambit.  The
interactions here are not with another person but with a website.  Nor are they personal conversations or
messages being intercepted, but rather the tracking of a website user's
browsing of, and interaction with, information published on a website.  
      As explained infra, nothing in the text of
the statute makes unambiguously clear that the Legislature intended to reach so
far as to criminalize the secret recording of such web browsing
activities.  The statute's text does not
define "communication"; its text contains numerous references to
communications that are person-to-person; and dictionary definitions do not
provide a firm answer either way.  The
legislative history is focused on the secret interception of person-to-person
conversations and messaging, particularly private ones.  While the Legislature plainly intended the
wiretap act to prohibit future technological means of such interceptions, it is
not at all clear that the Legislature intended the statute's prohibition on
intercepting "communications" to include, as supposed
"communications," the web browsing alleged here.    
      Because the meaning of
"communication" in this context is ambiguous, we must therefore apply
the rule of lenity.  When "we find
that the statute is ambiguous or are unable to ascertain the intent of the
Legislature, the defendant is entitled to the benefit of any rational
doubt" (citation omitted). 
Commonwealth v. Montarvo, 486 Mass. 535, 542 (2020).  
      If the Legislature intends for the wiretap
act's criminal and civil penalties to prohibit the tracking of a person's
browsing of, and interaction with, published information on websites, it must
say so expressly.  Other States and the
Federal government have attempted to update their wiretap laws in response to
technological change and done so in a variety of ways.  
      Make no mistake, the hospitals' alleged
conduct here raises serious concerns, and may indeed violate various other
statutes and give rise to common-law causes of action more specifically directed
at the improper handling of confidential information, particularly confidential
medical information.  And we do not in
any way minimize the serious threat to privacy presented by the proliferation
of third-party tracking of an individual's website browsing activity for
advertising purposes.  These concerns,
however, should be addressed to the Legislature.  
      Because we conclude that the statute is
ambiguous and the rule of lenity should apply, we reverse the Superior Court
judge's denial of the hospitals' motions to dismiss.[3]
      1. 
Background.  a.  Facts alleged.  "We summarize the factual allegations
set forth in the complaint[s] and in the undisputed documents incorporated by
reference in the complaint[s,] . . . accepting as true all well-pleaded
facts alleged" (quotation omitted). 
Six Bros., Inc. v. Brookline, 493 Mass. 616, 618 (2024), quoting
Osborne-Trussell v. Children's Hosp. Corp., 488 Mass. 248, 250, 253 (2021).
      i. 
Hospital websites.  BIDMC and NEBH
operate hospitals in the Commonwealth, providing care to patients in Boston and
the surrounding communities.  The
hospitals maintain websites, which provide general information about the
hospitals and other medical information to patients and the public.  Although the websites also contain separate
patient portals containing patients' personal medical information, Vita does
not allege that the information contained on such patient portals was
intercepted or transmitted to others.  
      Each hospital's website provided the
following:  general information about the
respective hospital; information about healthcare services available at each
provider, addressing specific practice areas and health conditions; a
"Find a Doctor" function to search for physicians by specialty and
location; a portal for patients to access and to pay their medical bills
online; a portal for patients to access their individualized medical
information; and a feature for users to enter search terms to query information
collected on the website.  BIDMC's website
additionally provided medical information about specific health conditions,
including information on symptoms, causes, diagnoses, and treatments, and it
also allowed patients to schedule appointments through an online portal.
      ii. 
Vita's browsing activities.  While
the complaints make numerous allegations regarding users of the hospitals'
websites generally, which we describe below, Vita alleges that she herself
regularly used the websites to (1) obtain information about doctors (including
their credentials and backgrounds); (2) search for information on particular
symptoms, conditions, and medical procedures, both for herself and her husband;
and (3) obtain and review her husband's medical records through the website's
patient portal.  She does not, however,
allege that her husband's medical records or the contents of his patient portal
were in any way collected, intercepted, and transferred to third parties; that
any messages between her or her husband or other users and health care
professionals were intercepted or transmitted to others; or that she used the
hospitals' websites to schedule appointments.
      iii. 
Data that the hospitals allegedly collected.[4]  Although not specific to Vita's own use of
the hospitals' websites, the complaints also allege that the hospitals tracked
the following information regarding users visiting the hospitals'
websites:  (1) the uniform resource
locator (URL)[5] of the webpages visited; (2) the titles of those webpages; (3)
data about a user's web browser and device configurations (e.g., screen
resolution, device information, and browser settings); (4) the unique
identifiers used by third-party software providers to track individuals across
the website; and (5) a user's Internet protocol (IP)[6] address.  According to the complaints, this information
permitted third-party software providers to create "browser
fingerprints," which were capable of associating a particular individual
with a unique combination of web browser settings.  
      Vita also alleges that certain information
about a user's activities on the hospitals' websites was collected.  This information included the following:  (1) how, when, and where a user scrolled and
clicked through different parts of a webpage;[7] (2) whether a user navigated
to a webpage containing a form for new patients requesting appointments, as
well as the department the user selected, and whether the user submitted the
form, although not the information the user entered into the form (with the
exception of the department selection);[8] (3) the contents of any search a
user made on the websites; (4) the filtering criteria selected by a user on the
"Find a Doctor" webpage, including specialty, location, gender, and
language; (5) whether the user "reserved a spot" in line at the
hospitals' urgent care; (6) whether the user navigated to the webpage for
paying medical bills; (7) whether the user navigated to the patient portal
where the user could access medical records and other personal medical
information, although not the contents of records or communications within that
portal; and (8) whether, when navigating to the patient portal, the user
clicked the "login" button for existing patients or the "sign up
now" button for patients seeking to create new accounts.[9]
      iv. 
Third-party tracking software and the sharing of such information for
marketing purposes.  Vita alleges that
the websites contained tracking software, developed by third parties, that
allowed the hospitals and third parties to monitor the use of the hospitals'
websites.  These third parties included
Facebook and Google, each offering similar software, "Meta Pixel" and
"Google Analytics," which allowed hospitals to track user activity on
their websites.  The software
simultaneously collected and transmitted to the third-party software providers
information about the websites' users and the users' interactions with the
websites.  The third-party software
providers, in turn, marketed the data to merchants and delivered targeted digital
advertisements tailored to individual users. 
Vita's complaints allege that this widespread targeted marketing
activity is highly significant economically. 
According to the complaint, "Google derives a substantial portion
of its revenues through individually targeted advertising," and "Facebook
derives most of its revenues from selling targeted advertising to users of its
platforms, including Facebook and Instagram."[10]  
      v. 
The hospitals' disclosures.  The
hospitals included a pop-up message on their websites disclosing, "We use
cookies and other tools to enhance your experience on our website and to
analyze our web traffic."  The
pop-up messages linked to privacy policies summarized below.[11]  Both hospitals had in place nearly identical
privacy policies.  The policies
(inaccurately and misleadingly, according to Vita) reassured users that
"[the
hospital] is committed to protecting your privacy.  The [hospital's] website allows you to visit
most areas without identifying yourself or providing personal information.  For those areas where you elect to provide
identifiable information, we assure you that we make every effort to protect
your privacy."
      The hospitals also disclosed that they
"routinely gather[ed] data on website activity, such as how many people
visit the site, the pages they visit, where they come from, how long they stay,
etc.," to "improve site content and overall usage."  However, the hospitals represented that such
data "is collected on an aggregate, anonymous basis, which means no
personally identifiable information is associated with the data."  The hospitals further claimed that
"[t]his information is not shared with other organizations" and that
"[e]xcept for authorized law enforcement investigations or other facially
valid legal processes, we will not share any information we receive with any
outside parties."  
      The privacy policies also disclosed
(albeit again allegedly incompletely and misleadingly) some third-party data
tracking or sharing.  The hospitals
stated that they and their "Third Party Service Provider[s]"
collected and saved "the default information customarily logged by
worldwide web server software," which included "date and time,
originating IP address and domain name[12] . . . , object requested,
and completion status of the request."  They further disclosed that this information
"may be kept for an indefinite amount of time, [and] used at any time and
in any way necessary to prevent security breaches and to ensure the integrity
of the data on our servers."  
      b. 
Prior proceedings.  Vita filed
separate complaints –- one against BIDMC and one against NEBH –- each alleging,
on Vita's behalf and purportedly on behalf of a class of similarly situated
persons,[13] that the hospital violated the wiretap act by aiding the
third-party software providers to intercept communications.  Each hospital separately filed a motion to
dismiss pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).  A Superior Court judge denied both motions in
separate opinions; she reported her decisions to the Appeals Court pursuant to
Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996).  Subsequently, we allowed the hospitals'
consolidated request for direct appellate review.
      2. 
Discussion.  a.  Standard of review.  "We review the denial of a motion to
dismiss under Mass. R. Civ. P. 12 (b) (6) . . . de novo."  Marsh v. Massachusetts Coastal R.R., 492
Mass. 641, 645 (2023), cert. denied, 144 S. Ct. 2519 (2024), quoting Dunn
v. Genzyme Corp., 486 Mass. 713, 717 (2021). 
"In doing so, we accept 'as true all well-pleaded facts alleged in
the complaint, drawing all reasonable inferences therefrom in the plaintiff's
favor, and determining whether the allegations plausibly suggest that the
plaintiff is entitled to relief.'" 
Marsh, supra at 645-646, quoting Lanier v. President & Fellows of
Harvard College, 490 Mass. 37, 43 (2022).[14] 
See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008)
("Factual allegations must be enough to raise a right to relief above the
speculative level . . ." [citation omitted]).
      b. 
Standing.  We first address the
hospitals' argument that Vita has not alleged an actual injury arising from the
hospitals allegedly aiding third-party software providers to record secretly
her interactions with the hospitals' websites; thus, they contend, Vita lacks
standing to pursue a claim under the wiretap act.  See Murchison v. Zoning Bd. of Appeals of
Sherborn, 485 Mass. 209, 218 (2020) (where plaintiffs "lack standing
. . . we order[] dismissal of the appeal without reaching the
merits").
      A plaintiff bears the burden of
establishing standing to bring a cause of action; more specifically, at this
stage, she must plead facts sufficient to "demonstrate a nonspeculative
particular and personal harm" resulting from the challenged action.  Murchison, 485 Mass. at 212.  See Animal Legal Defense Fund, Inc. v.
Fisheries & Wildlife Bd., 416 Mass. 635, 638 (1993) ("only persons who
have themselves suffered, or who are in danger of suffering, legal harm can
compel the courts to assume the difficult and delicate duty of passing upon the
validity of the acts of [another] branch of government" [citation
omitted]).  "A party has standing
when [she] can allege an injury within the area of concern of the statute or
regulatory scheme under which the injurious action has occurred."  Penal Insts. Comm'r for Suffolk County. V.
Commissioner of Correction, 382 Mass. 527, 532 (1981), quoting Massachusetts
Ass'n of Indep. Ins. Agents & Brokers v. Commissioner of Ins., 373 Mass.
290, 293 (1977).  
      Thus, to determine whether a plaintiff has
standing, we look to the statute itself to determine whether the Legislature
intended to confer standing to a person in the plaintiff's position.  See, e.g., Massachusetts State Auto. Dealers
Ass'n v. Tesla Motors MA, Inc., 469 Mass. 675, 683 (2014).  Relevant here, the wiretap act provides a
private cause of action to "[a]ny aggrieved person whose oral or wire
communications were intercepted, disclosed or used except as permitted or
authorized by this section or whose personal or property interests or privacy
were violated by means of an interception."[15]  G. L. c. 272,
§ 99 Q.  The act further
provides for statutory damages, regardless of whether the aggrieved person
suffered any actual damages.  Id.  
      Vita alleges that the hospitals violated
the act by assisting third parties to record contemporaneously her interactions
with the hospitals' websites without her consent or knowledge.  In her case, those allegations are limited to
searching for information related to doctors and symptoms on the websites.  This alleged violation of the act falls
"within the area of concern of the statute . . . under which the
injurious action has occurred." 
Penal Insts. Comm'r for Suffolk County, 382 Mass. at 532, quoting
Massachusetts Ass'n of Indep. Ins. Agents & Brokers, 373 Mass. at 293.  See Pine v. Rust, 404 Mass. 411, 414 (1989)
(wiretap act "grants a civil remedy to any aggrieved person whose
communications were intercepted, disclosed, or used, except as authorized by
the statute").  Thus, Vita has
established standing regarding these claims because she has alleged a
particular, personalized, nonspeculative, injury arising from an alleged
violation of the act.[16]
      c. 
Statutory construction.  As Vita
has standing to pursue her personal allegations, we turn to the main issues in
these cases, particularly the meaning of "communication" and
"interception" under the act, which are questions of statutory
interpretation. 
"[A] statute
must be interpreted according to the intent of the Legislature ascertained from
all its words construed by the ordinary and approved usage of the language,
considered in connection with the cause of its enactment, the mischief or
imperfection to be remedied and the main object to be accomplished, to the end
that the purpose of its framers may be effectuated" (citation omitted).
Harvard Crimson,
Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749
(2006).  We begin with a statute's plain
language.  See Matter of the Estate of
Mason, 493 Mass. 148, 151-152 (2023).  We
do not "interpret words in a statute in isolation"; rather, we
"must look to the statutory scheme as a whole so as to produce an internal
consistency within the statute." 
Outfront Media LLC v. Assessors of Boston, 493 Mass. 811, 818 (2024),
quoting Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483
Mass. 600, 605 (2019).  
      "Ordinarily, where the language of a
statute is plain and unambiguous, it is conclusive as to legislative
intent."  Six Bros., Inc., 493 Mass.
at 622, quoting Sharris v. Commonwealth, 480 Mass. 586, 594 (2018).  But "[w]here the statutory language is
not conclusive, we may 'turn to extrinsic sources, including the legislative
history and other statutes, for assistance in our interpretation.'"  HSBC Bank USA, N.A. v. Morris, 490 Mass. 322,
332-333 (2022), quoting Chandler v. County Comm'rs of Nantucket County, 437
Mass. 430, 435 (2002).
      i. 
Statutory background.  The wiretap
act makes it a crime to "willfully commit[] an interception, attempt[] to
commit an interception, or procure[] any other person to commit an interception
or to attempt to commit an interception of any wire or oral
communication."  G. L. c. 272,
§ 99 C 1.  "Wire
communication" is defined as "any communication made in whole or in
part through the use of facilities for the transmission of communications by
the aid of wire, cable, or other like connection between the point of origin
and the point of reception."  G. L. c.
272, § 99 B 1.  An "oral
communication" is "speech, except such speech as is transmitted over
the public air waves by radio or other similar device."  G. L. c. 272, § 99 B 2.  "Interception" means to
"secretly hear, secretly record, or aid another to secretly hear or
secretly record the contents of any wire or oral communication through the use
of any intercepting device by any person other than a person given prior
authority by all parties to such communication."  G. L. c. 272, § 99 B 4.       
      The statute provides for both criminal
penalties and a civil remedy for wiretap act violations.  Willful interceptions of oral or wire
communications are punishable by a fine of up to $10,000, imprisonment for up
to five years, or a combination of fines and imprisonment.[17]  G. L. c. 272, § 99 C 1.  The act also criminalizes the possession of
an intercepting device or permitting another person to use such a device, which
is a misdemeanor punishable by imprisonment of up to two years, a fine of
$5,000, or both.  G. L. c. 272, § 99
C 5.  Willful disclosure or use of the
contents of any wire or oral communication, knowing that the information was
obtained through interception is also a misdemeanor with the same
punishment.  G. L. c. 272, § 99
C 3.  The statute also provides a civil
remedy for any "aggrieved person whose oral or wire communications were
intercepted, disclosed or used except as permitted or authorized by
[statute]."  G. L. c. 272, § 99
Q.  "[A]n interception need not rise
to the level of criminal conduct covered by the penal provisions of the law"
to support a civil claim; in particular, a civil claim does not require that
the conduct be willful.  Pine, 404 Mass.
at 414.  The act provides for
"actual damages but not less than liquidated damages computed at the rate
of $100 per day for each day of violation or $1000, whichever is higher,"
as well as punitive damages.  G. L. c.
272, § 99 Q 1-2.  A plaintiff is
also entitled to attorney's fees and other litigation costs.  G. L. c. 272, § 99 Q 3.
      ii. 
Communication.  Vita contends that
the meaning of "communication" is broad enough to encompass all her
alleged interactions with the hospitals' websites.  We conclude that the statutory term
"communication" is ambiguous as applied to the web browsing
activities allegedly intercepted. 
Neither the plain text of the statute nor dictionary definitions make
clear whether such activity amounts to "communication," and the
legislative history is concerned with a different type of surveillance.  Thus, the rule of lenity must apply, thereby
entitling the defendants to "the benefit of any rational doubt" in
the construction of the statute (citation omitted).  Montarvo, 486 Mass. at 542.
      General Laws c. 272, § 99, does
not define the word "communication," but rather the means or method
of "communication" -- i.e., wire or oral.[18]  The statute does include, however, a number
of examples of communications that shed at least some light on the
Legislature's intended meaning.  For
example, one of the requirements for a warrant under the wiretap act is
"[a] statement that the oral or wire communications sought are material to
a particularly described investigation or prosecution and that such
conversations are not legally privileged" (emphasis added).  G. L. c. 272, § 99 F 2 e.  The statute also repeatedly references
telephones and telegraphs, carving out permissible activities in relation
thereto.  See G. L. c. 272, § 99 B
3, D 1, F 2, I 3, J 1, L 1 (telephone); G. L. c. 272, § 99 B 3,
F 2, I 3, J 1, L 1 (telegraph).[19]  The
statute's text thus makes plain the Legislature's intent to address at least
conversations in person or over the telephone or person-to-person messages
communicated through the use of wire or cables. 
Accordingly, it does seem clear that the plain meaning of
"communication" includes messages and conversations[20] between
people through the use of wire or cable, including by means of e-mail, text
message, chat, instant message, or the equivalent.  Indeed, conversations and messages between
people accord with our common understanding of communications.  Private conversations in person or over the
telephone or private person-to-person messages communicated through the use of
wire or cables are the core type of communication the wiretap law was designed
to address.  E-mail messages and text
messages also plainly involve person-to-person messaging over a wire or cable,
so those too fall within the plain meaning. 
Similarly, online chats and instant messaging, where actual people
communicate with each other, are plainly covered as well, as they involve person-to-person
messaging over a wire or cable. 
      Notably, however, Vita's complaints do not
allege communications between people in this commonsense way.  The complaints repeatedly characterize the
intercepted communications as being between Vita and each hospital's website,
not between Vita and hospital personnel, understandably, given that the
allegedly intercepted communications consist of what would commonly be called
web browsing by Vita.[21]  It is far less
clear based on the plain text of the statute that the term
"communication" extends to all interactions between a user and a
website.  When a user browses a public
website, and accesses databases and other information readily available to
anyone on the Internet, the user is not speaking or messaging with another
person but rather interacting with the website; the user is also not engaged in
personal conversation or messaging but rather browsing and interacting with the
published information on the website.[22]
      While we often turn to dictionaries to aid
in understanding the plain meaning of undefined statutory terms, here,
dictionaries do not provide a ready answer to the question whether web browsing
activities of the kind Vita alleges she engaged in amount to
"communication" with the website on which one is browsing or with the
website's owner or author.[23]  Most
definitions of "communication" refer to an "interchange" or
"exchange" of information, implicitly between people, but without
expressly defining who or what need be on either end.[24]  Some definitions, are even more explicit,
referencing persons or individuals on both sides of a communication, thereby
strongly suggesting that mere accessing of information published on a website
may not qualify.  See, e.g.,
Merriam-Webster Online Dictionary, https://www.merriam-webster.com/?dictionary
/communication
[https://perma.cc/7VX3-KSG7] (defining communication as "a process by
which information is exchanged between individuals through a common system of
symbols, signs, or behavior" [emphasis added]); Oxford English Dictionary
Online (defining communication as "[i]nterpersonal contact, social
interaction, association, intercourse"); Black's Law Dictionary 350 (12th
ed. 2024) (defining communication as "the process of bringing an idea to
another's perception" [emphasis added]).
      In attempting to argue nonetheless that
the term "communication" in the statute does unambiguously encompass
web browsing, Vita relies on the preamble of the wiretap act.  The clause Vita focuses on states that
"the uncontrolled development and unrestricted use of modern electronic
surveillance devices pose grave dangers to the privacy of all citizens of the
[C]ommonwealth," and thus the "secret use of such devices by private
individuals must be prohibited."  G.
L. c. 272, § 99 A.  This clause
doubtless does state the Legislature's intent to protect the Commonwealth's
citizens from the threat to privacy posed by evolving modern methods of
electronic surveillance.[25]  And, as
discussed, the term "communication" in the wiretap act doubtless does
extend today to protecting person-to-person communications from Internet-based
means of interception.  However,
notwithstanding the clause's plain statement of the Legislature's intent to protect
citizens' privacy against new surveillance methods, the clause does not
directly address the nature of the protected communications themselves and
whether, as here, the act protects against interception of the act of browsing
a website, rather than a person-to-person communication. 
      Ultimately, we cannot conclude that the
wiretap act unambiguously prohibits and, indeed, criminalizes the interception
of web browsing activity, because there appears to be a difference in kind and
not degree between interactions on a website available to the public and
private conversations in your house or on your telephone.  In essence, we are not here dealing with just
new means of communication, such as the difference between communicating with
another person on a cell phone rather than a landline, or a text message rather
than a telegraph message.  See
Commonwealth v. Moody, 466 Mass. 196, 198 (2013) (concluding wiretap act
applies to interception of cell phone calls and text messages).  Browsing and accessing the information
published on a website is significantly different from having a conversation or
sending a message to another person.[26] 
As explained previously, the user is not communicating with another
person but instead interfacing with pre-generated information on a
website.  The user is also not engaging
in a conversation but accessing published information and databases.[27]  Given these differences, we cannot conclude
based on the relevant text of the statute that the Legislature unambiguously
intended to criminalize activities that do not capture such person-to-person
communications or messaging. 
      In sum, the text of the wiretap act is
inconclusive at best as to whether website browsing is a
"communication" protected by the act.[28]
      iii. 
Legislative history.  As the text
of the statute does not resolve the ambiguity, "we may 'turn to extrinsic
sources, including the legislative history . . . for assistance in our
interpretation.'"  HSBC Bank USA,
N.A., 490 Mass. at 332-333.  When we do
so here, we conclude that the Legislature was chiefly concerned about the
secret recording or monitoring of person-to-person communications.  There is nothing in that legislative history
suggesting that the Legislature intended to extend the act, and its criminal
penalties, beyond the interception of person-to-person conversations or
messaging.
      From the very beginning, the Legislature
repeatedly referred to eavesdropping on private conversations and the use of
covert electronic recording devices that could be placed in a home or business
or used to tap a telephone.  In 1964 the
Legislature established a commission for the "investigation and study of
the laws relative to eavesdropping and the use of any electronic recording
device, or wireless tap or electronic tap" (emphasis added).  Senate Bill No. 201 (1964).  See Commonwealth v. Tavares, 459 Mass. 289,
294-295 (2011).
      An interim committee report from April
1967 described various eavesdropping devices that were commercially available.
See 1967 Senate Doc. No. 1198, at 3. 
These included the "parasite bug," a "subminiature
transmitter less than half the size of a pack of cigarettes, which broadcasts
both sides of a telephone conversation." 
Id.  There was also the "room
bug," capable of "transmit[ting] a very clear signal at least [seven]
blocks in downtown Boston" and "pick[ing] up a whisper at [twenty]
feet."  Id.  See Rainey, 491 Mass. at 645 ("In April
1967, the commission issued an interim report, which focused on various types
of 'eavesdropping devices,' namely 'bug[s]'").  The future development of such eavesdropping
devices was recognized to be particularly "frightening" and
unpredictable.  See 1967 Senate Doc. No.
1198, at 4.  See also Commonwealth v. Hyde,
434 Mass. 594, 608 n.7 (2001) (Marshall, C.J., dissenting) ("The [April]
1967 Report makes clear that what concerned the Legislature were 'eavesdropping
devices' ['bugs'] and other sophisticated inventions of then-recent origin
. . .").  This report also
noted the recent discovery that the New England Telephone and Telegraph Company
intercepted "customer-to-customer calls and customer-to-company
calls" in order to check "the performance of the company's equipment
and employees."  1967 Senate Doc.
No. 1198, at 4.  See Commonwealth v.
Ennis, 439 Mass. 64, 68 n.10 (2003) (noting that special commission's concern
about secret electronic eavesdropping by private citizens was spurred by not
only testimony about bugging devices but also revelation that telephone company
"secretly record[ed] private telephone calls").  
      Later commission reports also repeatedly
referred to the recording of or listening in on private conversations.  See, e.g., 1967 Senate Doc. No. 1469, at 2
("the availability of instruments for overhearing secretly private
conversations is immense"); 1968 Senate Doc. No. 1132, at 9 (proposing
revision of wiretap act "to strictly prohibit electronic eavesdropping and
wiretapping of other persons' conversations without permission").  Commissioners Elliot B. Cole and William P.
Homans, Jr., concurred in the legislative recommendations, but wrote separately
to emphasize the importance of the all-party consent requirement in the
proposed law.  1968 Senate Doc. No. 1132,
at 10.  They voiced an overarching concern
about the secret interception and recording of private conversations, quoting
an academic who explained that "the individual expresses his personality
in private conversations."  Id. at
12.  See Hyde, 434 Mass. at 608 n.6
(Marshall, C.J., dissenting) ("A concurring report filed by two members of
the special commission, [Cole and Homans], makes abundantly clear that the
'prohibition of wiretapping and eavesdropping by the public' was to protect the
privacy of citizens engaged in personal conversations"). 
      This legislative history is therefore
directed at the invasion of privacy and threat to free expression from secret
surveillance of private conversations. 
See Commonwealth v. Rivera, 445 Mass. 119, 127 n.10 (2005) ("The
report giving rise to the statute noted repeatedly that the commissioners were
concerned with the protection of private 'conversations,' particularly by
devices used to monitor telephone lines and by devices placed in private
locations").  Electronic
"bugs" that could be covertly placed in a home or business or that
could tap a telephone line to listen in on such conversations were also of
particular concern, and the Legislature recognized that scientific developments
here were especially frightening.  See
1967 Senate Doc. No. 1198, at 4; Rivera, supra. 
      As the Internet did not exist, there was,
of course, no discussion of whether the tracking and sharing of a user's
browsing or other activity, via software and computer code, on public websites
would be considered criminal.  Indeed,
there was no discussion whatsoever of computers or software in the legislative
history.  Nor was there any discussion of
what might be considered historic analogies to website analytics and
advertising, such as television[29] stations monitoring what shows or
commercials viewers were watching or businesses or nonprofit organizations tracking
brick-and-mortar or mail-order purchasing decisions or inquiries, or compiling
customer lists, and sharing such information with other businesses or
nonprofits without the customer's consent. 
Any such discussion in the legislative history might have provided some
suggestion that the Legislature was prepared to extend the application of the
act, and thus the meaning of "communication" and
"interception," well beyond the covert interception of private
conversations and private messages. 
There is, however, nothing like that in the legislative history.
      The legislative history's discussion of
the monitoring of person-to-person business telephone calls is also
informative, as the Legislature ultimately concluded that such monitoring of
person-to-person calls was permissible, at least for telephone companies and
banks, if done in the ordinary course of business.[30]  In allowing such monitoring even of
person-to-person calls, the Legislature took into account practical business
realities as well as privacy concerns.
      In sum, the legislative history is focused
on the secret interception of person-to-person conversations and messaging,
particularly private ones.  The
electronic surveillance devices, and the "frightening" future of such
devices, with which the Legislature was concerned were covert recording devices
that could be used to "bug" one's home or business or tap one's
telephone line to listen in on such conversations.  The Legislature also recognized that ordinary
business realities needed to be considered, allowing some monitoring of even
private person-to-person conversations. 
While the legislative history thus evinces a focus on addressing the
privacy threats posed by evolving surveillance methods, it does not provide a
basis for concluding that the Legislature intended that the term
"communication" would itself over time extend beyond person-to-person
communications, such as to encompass a human's interactions with a
website.  The legislative history
therefore provides no sound basis for concluding that the tracking of
human-website interactions for website analytics and digital advertising
purposes, via commonly employed technologies, is a "communication"
under the wiretap act.
      d. 
Case law.  Our case law has never
extended the meaning of "communication" beyond person-to-person
interactions.  Rather, our cases have
always involved the interception of person-to-person conversations and
messages.  See, e.g., Commonwealth v.
Morris, 492 Mass. 498, 501 (2023) (defendant's interview with police recorded);
Rainey, 491 Mass. at 633 (video and audio of victim's report to police officer
recorded by body-worn camera); Curtatone v. Barstool Sports, Inc., 487 Mass.
655, 657-658 (2021) (telephone conversation recorded by blogger); Moody, 466
Mass. at 198 (text messages intercepted); Tavares, 459 Mass. at 294 (informant
recorded conversations with defendant using concealed recording device).  None involved a person browsing or otherwise
interacting with a public website.  Most
of the cases involved the interception of private interpersonal conversations,
which we have emphasized is the core statutory concern.  See Rivera, 445 Mass. at 127 n.10.  Indeed, a crucial fact in Rainey and Morris,
two cases in which we found no statutory violation, was that the recording at
issue "was not being used as an investigative tool to secretly eavesdrop
on an otherwise private conversation" (emphasis added).  Morris, supra at 506, quoting Rainey, supra
at 643-644.            
      Moreover, we have previously rejected broad
interpretations of the word "communication" that expand the scope of
the wiretap act well beyond the secret recordings of private conversations the
Legislature intended to prevent.[31]  See
Commonwealth v. Gordon, 422 Mass. 816, 832-833 (1996) (rejecting "literal"
reading of act "as making unlawful the audiotaping of booking procedures
without the knowledge of the persons being booked, and as subjecting the
responsible police officers to severe penalties therefor" in absence of
more specific evidence of Legislature's intent to do so).  See also Morris, 492 Mass. at 506 (recording
of defendant's voluntary statements to police after receiving Miranda warnings
did not violate wiretap act absent indication Legislature intended such
result); Rainey, 491 Mass. at 643-644 (rejecting application of wiretap act to
body-worn camera recording by police officer of victim's statement even while
acknowledging wiretap act "could be construed literally as the defendant
suggests").  These cases are
inconsistent with Vita's characterization of a legislative intent to provide
broad protections for all website activities, even where they do not involve
person-to-person conversations or messaging. 
      The cases Vita relies upon do not resolve
the wiretap act's ambiguity in this regard. 
In Moody, 466 Mass. at 198, we held that the wiretap act applied to text
messages and calls sent and received with cell phones.[32]  It is difficult to extrapolate much from
Moody's holding that cell phone text messages and calls are "wire communications"
under the act because those forms of communication are clearly person-to-person
conversations and messaging; the case just involved updated technology to make
such calls and send such messages.  
      The cases cited by Vita and the dissent
interpreting the Federal wiretap act, Title III of the Omnibus Crime Control
and Safe Streets Act of 1968, Pub. L. No. 90–351, 82 Stat. 211 (1968) (Title
III), do not resolve the ambiguity presented by our State's statute.  These cases do not engage in depth, if at
all, with the meaning of "communication."  See, e.g., In re Facebook, Inc. Internet
Tracking Litigation, 956 F.3d 589, 607 (9th Cir. 2020), cert. denied sub nom.
Facebook, Inc. v. Davis, 141 S. Ct. 1684 (2021) (characterizing "GET
requests," in which website transmits user's URL information to
third-party website, as communication without analyzing meaning of
communication).  Further, Title III was
amended by the Electronic Communications Privacy Act of 1986, Pub. L. No.
99–508, 100 Stat. 1848 (1986), to cover "electronic communication,"
defined as "any transfer of signs, signals, writing, images, sounds, data,
or intelligence of any nature transmitted in whole or in part by a wire, radio,
electromagnetic, photoelectronic or photooptical system."  18 U.S.C. § 2510(12).  That amendment was drafted almost twenty
years after our wiretap act, during at least the dawn of the personal computer
era.  See Chayka, The Birth of the
Personal Computer, The New Yorker (May 18, 2023), https://www.newyorker
.com/culture/infinite-scroll/the-birth-of-the-personal-computer
[https://perma.cc/S6N9-PLFK] (noting that among first "microcomputer
kits," was Altair 8800, which debuted in 1975, followed shortly by first
Apple computer in 1976, and Apple II in 1977, which is considered precursor to
modern personal computers).  It is also
no surprise then that cases applying Title III do not struggle over the
definition of "communication," because the broad definition of
"electronic communication" would appear to cover many website
browsing activities.  However, our
wiretap act was never similarly amended to add a separate definition of
"electronic communication." 
Moody, 466 Mass. at 207-208.[33]  

      Title III also differs importantly from
our wiretap act in providing a one-party consent exception.  See 18 U.S.C. § 2511(2)(d) ("It
shall not be unlawful . . . for a person . . . to intercept a wire,
oral, or electronic communication, where such person is a party to the communication
or where one of the parties to the communication has given prior consent
. . .").  Thus, the scope
of liability under the Federal law is significantly limited in a way that our
wiretap act, which requires the consent of all parties to a communication, is
not.  See G. L. c. 272, § 99 B 4
(permitting interception only by "a person given prior authority by all
parties to such communication"). 
The Federal law therefore provides no basis for resolving the ambiguity
here.
e.  Rule of lenity.  After examining the statute's text and
legislative history, and reviewing our own case law, we are left with serious
doubts as to whether browsing and interacting with a public website are a
"wire communication" under the wiretap act.  Accordingly, the statute is ambiguous.  "Under the rule of lenity, if we find
that the statute is ambiguous or are unable to ascertain the intent of the
Legislature, the defendant is entitled to the benefit of any rational
doubt" (citation and quotation omitted). 
Montarvo, 486 Mass. at 542. 
While
the instant cases concern civil liability under the wiretap act, the act also
has significant criminal penalties, including up to five years in State prison,
and accordingly, the rule of lenity should be applied.  See 3 S. Singer, Statutes and Statutory Construction
§ 59:4 (8th ed. Nov. 2023 update) ("If a law has both criminal and
civil applications, the rule of lenity governs its interpretations in both
settings").  See also Leocal v.
Ashcroft, 543 U.S. 1, 11 n.8 (2004) ("Because we must interpret the
statute consistently, whether we encounter its application in a criminal or
noncriminal context, the rule of lenity applies").[34] 
We
therefore cannot conclude, in "the absence of an express textual provision
or an indication of legislative intent," that browsing and other similar
website interactions of the kind Vita alleges she engaged in on the hospitals'
websites are "wire communication[s]" under the wiretap act.  See Anderson v. National Union Fire Ins. Co.
of Pittsburgh PA, 476 Mass. 377, 386 (2017). 
Activities such as entering a URL, accessing a specific webpage,
clicking on links, and scrolling through a webpage are clearly not the type of
person-to-person conversation or messaging unambiguously protected by the
act.  Similarly, the transmission of data
about a user's web browser configuration and IP address bear little resemblance
to person-to-person conversation.
We
also cannot deem as communications the interception of which might lead to
criminal penalties the act of simply running searches on the websites or
accessing information about doctors published on the websites, as alleged by
Vita.  These interactions with a website,
as explained above, differ in material respects from person-to-person
conversations and messaging.  The website
user is interacting with the website, not another person, and accessing
publicly available data, not having a personal conversation or sending a
personal message. 
In
analyzing whether the interception of this information constitutes a criminal
violation, we must keep in mind that the statute does not distinguish medical
information from other information, or hospital websites from other websites.[35]
Consequently, we must impose a common definition of communication of
information for all websites.  For
example, would it be a criminal violation if a user browses a music or sports
website, to inquire about particular songs or athletes, and the music website
or sports website tracks its users, and shares that information with Internet
advertisers without the user's consent? 
Under this interpretation, it would appear that thousands of website
owners could potentially face severe criminal and civil penalties for using
tracking tools needed to support an advertising-based business model that is so
common on the Internet.  See Amended
Opening Brief for Defendants-Appellants, at 24-25; Brief for National Retail
Federation and Retailers Association of Massachusetts, as Amici Curiae, at 3
("The technologies at issue in this case are found on all manner of
websites . . .").[36]
The
dissent likens the hospitals' websites to a virtual "customer service
representative or healthcare provider, receiving inquiries from patients about,
inter alia, a particular medical condition or specific physicians and, in
exchange, providing the hospitals' response."  Post at    .  The same can of course be said for all other
businesses' websites.  The dissent's
interpretations would also appear to apply to automated telephone directories
that ask us to dial particular numbers to access different types of
information.  Is each one of these
interactions a wiretap violation subject to criminal penalties, including a
prison sentence of up to five years, if it is monitored?  Moreover, unlike a call to a customer service
representative to seek information, there is not another person engaged in a
conversation when a website user searches for or requests information, and the
website provides pre-generated content that is publicly accessible.  
We
emphasize that Vita does not allege that her communications with a particular
physician, nurse, or other medical professional were intercepted.[37]  If such communications were intercepted,
these would be much different cases.  
We
also emphasize that the Legislature has provided other statutory and common-law
causes of action to address allegedly false, misleading, or deceptive activity
on the Internet, including statutory and common-law protections more directly
applicable to misrepresentations or misuse of private medical information.  See, e.g., Doe vs. Tenet Healthcare Corp.,
U.S. Dist. Ct., No. 23-12978-PBS (D. Mass. Apr. 23, 2024) (plaintiff stated
claims for negligence, breach of implied contract, unjust enrichment, breach of
fiduciary duty, right to privacy, and G. L. c. 93A violation, where
hospital website allegedly tracked and shared with third parties plaintiff's
website browsing activities).  For
example, G. L. c. 214, § 1B, provides a "right against unreasonable,
substantial or serious interference with [an individual's] privacy."  Deception or misrepresentation in a privacy
policy may also support a cognizable claim under G. L. c. 93A, and the powerful
remedies that statute provides.  See
Connor v. Marriott Int'l, Inc., 103 Mass. App. Ct. 828, 836 (2024) ("An
act or practice will be found deceptive if, first, there is a representation,
omission, or practice that, second, is likely to mislead consumers acting
reasonably under the circumstances, and third, the representation, omission, or
practice is material" [quotation and citation omitted]).  There are also, of course, many laws that
strictly protect patient information. 
See, e.g., G. L. c. 111, § 70E (giving every patient or resident of
medical facility right "to confidentiality of all records and
communications to the extent provided by law"); 42 U.S.C.
§ 1320d-6(a) (crime to knowingly obtain or disclose "individually
identifiable health information"). 
In
sum, the statutory language is ambiguous, and the legislative history is not
helpful regarding whether the alleged interceptions of Vita's uses of the
hospitals' websites are interceptions of "communications" within the
meaning of the wiretap act and thereby potentially subject to both civil and
criminal penalties.  Therefore, the rule
of lenity applies, and Vita's claims against the hospitals, which are based on
the wiretap act alone, should be dismissed. 
See Commonwealth v. Constantino, 443 Mass. 521, 525 (2005) (where
statute can "plausibly be found to be ambiguous" defendant should
receive "the benefit of the ambiguity" [citation omitted]).
3.  Conclusion.  For the foregoing reasons, we reverse the
Superior Court orders denying the hospitals' motions to dismiss the complaints.
So ordered.

WENDLANDT,
J. (dissenting).  Individuals in the
Commonwealth increasingly conduct their affairs over the Internet, sharing
often sensitive personal information with companies by using company websites
rather than landline telephones.  The
defendants New England Baptist Hospital (NEBH) and Beth Israel Deaconess
Medical Center, Inc. (BIDMC) (collectively, hospitals), created their own
online presence to communicate with their patients, encouraging engagement with
this electronic medium -- their websites -- as an alternative to the telephone
for patients to obtain information from and about the hospitals, and for the
hospitals to elicit information from patients related to their specific medical
needs and care.  
The
hospitals well understood that their websites were a means to communicate
privately with patients -- an inference that is not only reasonable, but almost
inescapable when one reads the hospitals' representations.  Mirroring protocols attendant to face-to-face
interactions between healthcare providers and patients, the hospitals assured
patients that they could use these platforms to share their individualized
medical concerns and inquiries privately and, in turn, to receive the
hospitals' tailored responses.  Patients
were invited to visit the hospitals' websites "without identifying"
themselves; for those who "elect[ed] to provide identifiable information,"
the hospitals promised to "make every effort to protect [their]
privacy."  Come, they told patients
like the plaintiff Kathleen Vita, use our websites as a virtual space where you
can share your private medical concerns, and start receiving our professional
medical advice, confidentially.
Then,
unbeknownst to their patients, the hospitals aided third parties to record this
healthcare information, allowing the third parties to create detailed portraits
of the patients' medical needs and to monetize this information for
advertisements targeted to those patients. 
Rather than candidly disclose this arrangement, the hospitals assured
patients that, on their websites, the patients' identities and privacy would be
maintained.  In short, the hospitals
lied.
Words
matter.  I agree with the court that the
words of a statute must be read in context, but they must be read.  To be sure, the Legislature in the 1960s,
when it passed G. L. c. 272, § 99 (wiretap act or act), may not
have divined how the Internet would revolutionize the way we communicate.  But because the Legislature chose particular
words, this understandable shortcoming does not mean, as the court concludes,
that the act is hopelessly ambiguous and unable to protect against the surreptitious
recordings that occurred here. 
Pertinent
to our query, the Legislature chose the term "communication" --
specifically, "any communication" -- to define the subject matter of
the act's protections (emphasis added), G. L. c. 272, § 99
B 1; it did not limit protections to the "person-to-person
conversations or messaging" that the court finds were the "core type
of communication" with which the Legislature expressed specific concern,
ante at    .  In my view,
the words "any communication" leave no room for ambiguity.  Where a technological advance (like the
telephone before it) revolutionizes how we communicate -- by selecting dropdown
filters specifying preferences to find and to book an appointment with an
available physician on a website, for example, rather than doing the same by
dialing a keypad and placing a call to the hospital using a telephone –- the
Legislature chose to protect these new ways of exchanging information against
electronic eavesdroppers.  
Indeed,
in an apparent attempt to avoid any lingering doubts about the protections it
envisioned, the Legislature made pellucid its intent by choosing specific
words, codifying them in the act's preamble. 
In words too clear to support any claimed ambiguity, the Legislature expressly
set forth its finding 
"that the
uncontrolled development and unrestricted use of modern electronic surveillance
devices pose grave dangers to the privacy of all citizens of the
commonwealth.  Therefore, the secret use
of such devices by private individuals must be prohibited."  (Emphases added.)
G. L.
c. 272, § 99 A.  The
Legislature had the clairvoyance to choose these particular words to indicate
that it was the tremendous power of electronic surveillance devices -‑ like the
tracking software at issue in the instant cases -- to enhance the ability to
snoop far beyond what could be done by the human ear alone that defined the
scope of the act's protections.  
The
court loses sight of this aim, apparently blinded by its determination that "tracking
tools [are] needed to support an advertising-based business model that is so
common on the Internet," ante at    , and by the stated
assumption that candidly disclosing this tracking to patients threatens
Facebook's and Google's bottom line, id. at    .  As a result, it concludes that when a patient
and her physician discuss frequently asked questions regarding the symptoms and
treatment options of a particular disease, either in person or by telephone,
that discussion cannot be "bugged" under the act.  But when the hospitals create an electronic
forum to allow that same information to be exchanged over the hospitals'
website, they can implant tracking code to record the discussion secretly and
then sell the information to the highest bidder without recourse in the
act.  When a patient telephones the
doctor's office to schedule an appointment, that conversation cannot be
recorded secretly by a modern surveillance device under the act; but when that
same exchange occurs on a website designed to facilitate such scheduling, it
bewilders the court to conclude that the act extends so far.  Under the court's construction (or lack
thereof), the act permits the hospitals to market their websites as purportedly
private spaces for dispensing medical information on a confidential basis, and
then, as alleged by Vita, to assist "silent third-part[ies] [to] watch[]
whatever [their patients are] doing." 
I disagree.
Of
course, public policy decisions regarding the protections afforded to our
communications over evolving technologies against electronic surveillance by
private parties need to be left to the Legislature; but once those decisions
have been made and set forth in clear language, as the Legislature has done in
the wiretap act, it is our function to enforce them.  Because, in words too plain to question, the
Legislature told us that the secret recordings alleged to have occurred here
fall squarely within the threat to privacy it enacted the wiretap act to curb,
and because those same words show that the Legislature intended that such
secret surveillance would not escape the act's reach when it occurs over a
website on the Internet rather than over a telephone or telegraph, I
respectfully dissent.  
1.  Standard of review.  "We review the denial of a motion to
dismiss under Mass. R. Civ. P. 12 (b) (6)[, 365 Mass. 754 (1974),] de
novo."  Marsh v. Massachusetts
Coastal R.R., 492 Mass. 641, 645 (2023), cert. denied, 144 S. Ct. 2519
(2024), quoting Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021).  "In doing so, we accept 'as true all
well-pleaded facts alleged in the complaint, drawing all reasonable inferences
therefrom in the plaintiff's favor, and determining whether the allegations
plausibly suggest that the plaintiff is entitled to relief.'"  Marsh, supra at 645-646, quoting Lanier v.
President & Fellows of Harvard College, 490 Mass. 37, 43 (2022).  See Iannacchino v. Ford Motor Co., 451 Mass.
623, 636 (2008) ("Factual allegations must be enough to raise a right to
relief above the speculative level . . ." [citation omitted]). 
Straying
from this standard, the court focuses on certain website features that Vita
"regularly" used, discussing Vita's putative failure to state with
sufficient clarity whether she also was among those healthcare consumers who
took advantage of each of the myriad of options made available by the hospitals
on their websites.  Such an application
of what appears to be a heightened pleading standard, or a premature analysis
of whether Vita is an appropriate class representative, is inconsistent with
the liberal rules applicable to Vita's complaints.  Cf. Mass. R. Civ. P. 9, 365 Mass. 751 (1974)
(heightened pleading standards applicable to claims of fraud);[1] Mass. R. Civ.
P. 23, as amended, 471 Mass. 1491 (2015) (setting forth rules for class
certification).  Drawing all reasonable
inferences in Vita's favor, as we must on a motion to dismiss, her
"regular" use of certain features on the hospitals' websites does not
limit our analysis on a motion to dismiss.   

2.  Communication.  Enacted in 1968 in response to "the
uncontrolled development and unrestricted use of modern electronic surveillance
devices," the wiretap act generally precludes aiding another to record secretly
the "contents" of "any wire or oral communication."  G. L. c. 272, § 99 A,
C.  A "wire communication" is
defined as "any communication made in whole or in part through the use of
facilities for the transmission of communications by the aid of wire, cable, or
other like connection between the point of origin and the point of
reception" (emphasis added). 
G. L. c. 272, § 99 B 1.  
The
instant cases present the questions whether the electronic exchanges of
information between Vita and the hospitals by means of the hospitals' websites
constituted "communication[s]" protected against surreptitious
monitoring as "wire communication[s]" by the wiretap act, and, if so,
whether Vita's complaints allege that the "contents"[2] of those
communications were intercepted in violation of the act.  
a.  Plain meaning.  The word "communication" is not
defined by the act.  In the absence of an
express statutory definition of the term, "[w]e derive the word['s] usual
and accepted meanings from sources presumably known to the statute's enactors,
such as [its] use in other legal contexts and dictionary
definitions."  Curtatone v. Barstool
Sports, Inc., 487 Mass. 655, 658 (2021), quoting Commonwealth v. Matta, 483
Mass. 357, 372 (2019).  See Matter of the
Estate of Mason, 493 Mass. 148, 151 (2023), quoting Metcalf v. BSC Group, Inc.,
492 Mass. 676, 681 (2023) ("In construing a statute, we begin with its
plain language"); Garcia v. Steele, 492 Mass. 322, 326 (2023), quoting
Sandifer v. United States Steel Corp., 571 U.S. 220, 227 (2014) ("words
will be interpreted as taking their ordinary, contemporary, common
meaning").  It is for this reason
that we turn to dictionaries as the first and primary source for the
construction of words that the Legislature used but left undefined.[3]  See Millis Public Sch. v. M.P., 478 Mass.
767, 775 (2018), quoting Commonwealth v. Samuel S., 476 Mass. 497, 501 (2017)
("We look initially 'to dictionary definitions as a guide to a term's
plain or ordinary meaning'").
i.  Dictionary definitions.  The definition of the term "communication"
is the "exchange of information, knowledge, or ideas, by means of speech,
writing, mechanical or electronic media, etc."  Oxford English Dictionary Online.  See Black's Law Dictionary 350 (12th ed.
2024) (defining communication as "[t]he interchange of messages or ideas
by speech, writing, gestures, or conduct; the process of bringing an idea to
another's perception"); Merriam-Webster Online Dictionary, https://www
.merriam-webster.com/?dictionary/communication
[https://perma.cc
/7VX3-KSG7]
("a process by which information is exchanged between individuals through
a common system of symbols, signs, or behavior"); American Heritage
Dictionary of the English Language 269 (1970) ("The exchange of thoughts,
messages, or the like, as by speech, signals, or writing"); Random House
Dictionary of the English Language 298 (1967) ("the imparting or
interchange of thoughts, opinions, or information by speech, writing, or
signs").
Considering
these definitions, I agree with the court that the plain meaning of
"communication" thus includes messages and conversations[4] between
people, including by means of e-mail, text message, chat, and instant
message.  Ante at
   .  However, I conclude
that the term also encompasses the "exchange" of medical
"information" and "knowledge" that occurred between Vita
and the hospitals "by means of" the hospitals' websites on the
Internet, an "electronic media."[5] 
See Oxford English Dictionary Online. 
This plain meaning derives directly from dictionary definitions.  
While
the court misapprehends the hospitals' websites as repositories for
"published," "pre-generated" medical data, the hospitals
know better.  As Vita asserts, they
created the websites as confidential dynamic forums on which they communicated
"interactive[ly]" with patients about the patients'
"personal" medical needs.  The
hospitals' websites were "designed for communications with healthcare
consumers," Vita contends. 
It
is important, then, to clarify the precise allegations that the court has labeled
sweepingly as "web browsing." 
Vita alleges that by means of the hospitals' websites, for example,
patients asked questions about physicians who met the patients' gender
preferences, geographic limitations, and desired areas of specialization
relevant to the patients' unique healthcare needs, and the hospitals answered
by identifying available doctors to meet these specified requirements.  Employing the websites, patients inquired
about the hospitals' ability to provide specific treatments and procedures
tailored to the particular maladies with which patients were afflicted; and
they received the hospitals' responses. 
On these websites, patients completed forms and dispatched requests to
the hospitals to book appointments with physicians specializing in the
patients' illnesses or to reserve a spot in the urgent care line, just as they
might by e-mail or by telephone.  
The
"private healthcare information" exchanged with the hospitals using
their websites, Vita alleges, included "individual's medical conditions,
doctors they might be seeing, medical searches the individual performs on the
websites, and personal medical information the user enters into forms on the
websites."  Inconvenient as these
factual allegations may be to the court's reframed narrative as to the nature
of the information exchanged between patients and the hospitals over the
websites, they cannot be disregarded as "embellish[ments]."  Ante at note 14.  Instead, because the allegations are ones of
fact, I accept them as true, drawing all reasonable inferences therefrom in
Vita's favor, as we must at this early stage in the pleadings.  Recasting these factual allegations as
"web browsing" does not alter their nature;[6] they involve exchanges
of information over an electronic media. 
As such, they fall within the plain meaning of
"communication."
Confirming
the dictionary definitions, courts generally describe exchanges of information
on the Internet between website owners and website users as
"communications," applying that word's plain and ordinary meaning.[7]  While not dispositive, their use of the word
"communication" to refer to these web-based exchanges of information
and the absence of any confusion as to its scope bolsters the conclusion that
the exchange of medical information alleged by Vita falls within the plain
meaning of the term.  
ii.  Context. 
Our analysis does not end with dictionaries; words must be read in the
context of the "statutory scheme as a whole."  Six Bros., Inc. v. Brookline, 493 Mass. 616,
622 (2024), quoting Plymouth Retirement Bd. v. Contributory Retirement Appeal
Bd., 483 Mass. 600, 605 (2019).  
A.  "Any communication."  Significantly, the act defines the phrase
"wire communication" to encompass "any communication" so
long as it is transmitted, at least in part, by aid of a wire, cable, or
similar connection (emphasis added). 
G. L. c. 272, § 99 B 1.  The use of the word "any" to modify
the word "communication" evinces the Legislature's intent to provide
sweeping protection for communications "of whatever kind."[8]
Department of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 131 (2002)
("[T]he word 'any' has an expansive meaning, that is, one or some
indiscriminately of whatever kind" [quotation and citation omitted]).  See Commonwealth v. Moody, 466 Mass. 196, 208
(2013) (wiretap act "define[s] 'wire communication' broadly").
This,
in turn, should clarify the court's present bewilderment.  The word "any" indicates the
legislative intent not to limit the act's protections to direct "person-to-person"
communications, to "personal" communications, to "private"
communications, to "substantive" "particularized"
communications or to the "core type" of communications available when
the act was passed.  Ante at   & note 8.  In this manner, the Legislature demonstrated
its intent to capture new communications technologies that employ wire, cable,
or other like connections even if those technologies altered the manner by
which we communicate. 
Dismissing
this obvious statutory context and rich resource for determining legislative
intent, the court instead places great weight on a subsection of the search
warrant provision of the act, which uses the terms "wire and oral
communications" interchangeably with "conversations," to claim
puzzlement whether "communications" are limited to direct
person-to-person conversations. 
Specifically, to obtain a search warrant authorizing the interception of
a wire or oral communication, the subsection requires that the warrant
application include "[a] statement that the oral or wire communications
sought are material to a particularly described investigation or prosecution
and that such conversations are not legally privileged" (emphasis
added).  G. L. c. 272,
§ 99 F 2 e.  In this
subtle manner, the court concludes, the Legislature might have intended to
narrow the breadth of oral and wire communications, previously and expressly
defined expansively to include, respectively, speech and "any
communication" through the requisite medium, to conversations or messages
between people such as by sending or receiving by e-mail, text message, chat,
instant message, or the equivalent. 
G. L. c. 272, § 99 B 1.
In
light of the express definition of "wire communication" and the
purpose conveyed in the act's preamble to protect against the threat to privacy
occasioned by modern electronic surveillance devices, discussed in further
detail infra, the court is mistaken.  See
Patel v. 7-Eleven, Inc., 489 Mass. 356, 364 (2022), S.C., 494 Mass. 562 (2024),
quoting Whitman v. American Trucking Ass'ns, 531 U.S. 457, 468 (2001)
("the Legislature 'does not, one might say, hide elephants in
mouseholes'").  Instead, this
singular use of the term "conversations" was intended to incorporate
the breadth of the phrase "oral and wire communications," as
previously discussed.
Similarly,
the court concludes that, because the act uses the words "telephone"
and "telegraph" several times, protected communications might be
limited to direct person-to-person conversations or messages as one might
conduct on a telephone or through a telegraph. 
Far from sowing confusion as to the scope of the phrase "any
communication," these references to telephone communications and messages
by telegraph show that "when the Legislature intend[ed]" to limit a
provision of the act to a particular type of communication, "it [knew] how
to say so explicitly" (citation omitted). 
Commonwealth v. Rossetti, 489 Mass. 589, 600 (2022).
Beyond
requiring that the medium of exchange include, at least in part, a wire, cable,
or like connection,[9] no qualifying phrase limits application of the act so as
to exclude an exchange of medical information and knowledge occurring between a
patient and a hospital by means of the hospital's website.[10]  See Plymouth Retirement Bd., 483 Mass. at 605
(we "look to the statutory scheme as a whole" to derive Legislature's
intent [citation omitted]).  Such an
exchange of information falls within "any communication."
Even
if recourse to the legislative history were proper,[11] it is telling that the
Legislature chose to protect "any communication" and not just the
private conversations or messages discussed in the legislative record;[12] this
choice to protect "any communication" must inform our
construction.  "We do not read into
the statute a provision which the Legislature did not see fit to put there, nor
add words that the Legislature had an option to, but chose not to
include."  Commonwealth v. Dones,
492 Mass. 291, 297 (2023), quoting Commonwealth v. Williams, 481 Mass. 799,
807-808 (2019).  
Accordingly,
while the Legislature was concerned principally with privacy, we have concluded
that the act's protections were not limited to situations where there existed a
reasonable expectation of privacy in the oral or wire communications.  Commonwealth v. Hyde, 434 Mass. 594, 601
(2001), quoting Commonwealth v. Jackson, 370 Mass. 502, 506 (1976) ("[W]e
would render meaningless the Legislature's careful choice of words if we were
to interpret 'secretly' as encompassing only those situations where an
individual has a reasonable expectation of privacy").  The same principles counsel rejection of any
proposed limit of "communications" to direct person-to-person
conversations or, as the court suggests, ante at    , to
conversations involving no "pre-generated" content on the part of one
of the parties to the communication.[13] 
See Dones, 492 Mass. at 297, quoting Williams, 481 Mass. at 807-808.
B.  Preamble. 
Additional context informing the construction of the word
"communication" comes from the act's preamble, on which we have
placed particular import in connection with our construction of the act.  See Commonwealth v. Rainey, 491 Mass. 632,
642 (2023) ("Where the Legislature has set forth its intent in the form of
a codified preamble, we consider the preamble as part of the whole statute
. . . to the extent that it does not conflict with the more specific
statutory provisions").[14]  See
also Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445
Mass. 745, 749 (2006) ("a statute must be interpreted
. . . in connection with the cause of its enactment, the
mischief or imperfection to be remedied and the main object to be
accomplished" [citation omitted]).
The
preamble codifies the Legislature's intent to provide comprehensive protections
to the privacy of individuals against surreptitious surveillance by private
parties.  It emphasizes the Legislature's
concern that "the uncontrolled development and unrestricted use of modern
electronic surveillance devices pose grave dangers to the privacy of all
citizens of the commonwealth," and it sets forth the legislative intent
that the "secret use of such devices by private individuals must be
prohibited."  G. L.
c. 272, § 99 A.  See
Curtatone, 487 Mass. at 657 (act prohibits all secret interceptions subject to
"a few narrow exceptions"). 
Narrowing the scope of the act's protections against secret
eavesdropping and secret recording to exclude exchanges of information, knowledge,
or ideas that occur between a patient and a hospital by means of the hospital's
website would contravene the Legislature's stated purpose as codified in the
preamble; the legislative purpose to protect against the dangers of electronic
eavesdropping is particularly relevant where, as here, that information
exchange reveals potentially sensitive medical information.  The preamble confirms the deliberate breadth
of the language "any communication" regardless of whether the
communication mirrors the manner by which telephone conversations were conducted.
Consistent
with the preamble, the legislative record reveals a concern over conduct
analogous to that which Vita alleges transpired here.  The report of a special commission tasked
with studying electronic eavesdropping and wiretapping prior to adoption of the
present act suggests that the Legislature was concerned by the ease with which
"newly developed inventions" permitted individuals to eavesdrop
electronically.  Commonwealth v. Ennis,
439 Mass. 64, 68 n.10 (2003), citing 1967 Senate Doc. No. 1198, at 3.  The software-based eavesdropping tool used by
the hospitals is precisely the sort of "modern electronic surveillance
device[]" that the Legislature sought to prohibit.  Contrary to the court's assertion, the fact
that the code was deployed on a personal computing device by the hospitals
despite their assurance of confidentiality is not less "frightening"
than placing a bug in a home or a telephone.[15]  Ante at    .  Certainly, the historical review does not
support the court's view that it is unclear whether the kinds of interceptions
at issue here would fall within the ambit of concerns motivating passage of the
act and set forth in its preamble.[16]     

C.  Person-to-person communications.  The court asserts that a communication between
a patient and a hospital using a website is not a communication between
individuals in a "commonsense way," ante at    ;
instead, the court declares that it is an interaction "with a
website," which the court describes as "published information"
-- a repository for a large volume of generic medical information, id. at
   .  But this is not how
the hospitals themselves describe this online forum, and for good reason.  The hospitals' websites function as
interactive mechanisms through which the hospitals communicate information
about, inter alia, their services and physicians to their patients and to the
public at large, and the websites function as electronic forums for the
hospitals to elicit information from patients concerning, inter alia,
particular medical needs, to provide patients with responsive information, and
to schedule appointments with specific providers.  
The
result is a personalized exchange of information specific to the patient's
healthcare inquiries and needs.  Unlike
the court, the hospitals understood that their websites were a means to
communicate privately with patients. 
Copying protocols required for face-to-face communications between
healthcare providers and patients, the hospitals assured patients that they
could use the websites to share their individualized medical concerns and
inquiries privately and, in turn, to receive the hospitals' tailored
responses.    
As
amici Massachusetts Health and Hospital Association, Inc., and Massachusetts
Medical Society acknowledge: 
"The
[I]nternet is often the first place that patients, family members, researchers,
and anyone curious about a particular medical condition or provider turn when
seeking health-related information. 
Hospitals and health care providers seek to help individuals by
providing online content designed to be responsive to those needs."
The websites, in
effect, act like the hospitals' customer service representative or healthcare
provider, receiving inquiries from patients about, inter alia, a particular medical
condition or specific physicians and, in exchange, providing the hospitals'
response in this modern medium.[17] 
Of
course, a patient is an individual on one end of this virtual call.  That individual asks for information
regarding a particular disease or procedure by clicking an available hyperlink
or typing in search terms.  She asks to
book an appointment by filling out a form on the website.  
On
the other end of the "call," there are also individuals.  These are the employees and representatives
of the hospitals, who are knowledgeable about, for example, the diseases or
procedures that were the subject of the patient's inquiry and who are
responsible for creating the answers to patients' frequently asked questions.  They are the hospitals' agents who provide
the information necessary to take the unique wishes of the individual patient
and to develop an algorithm to provide the responsive list of qualified
physicians.  They are the hospitals' representatives
who can take the patient's appointment request form and book the appointment
with the requested physician or the individuals at the hospitals responsible
for urgent care.[18]  The information on
the hospitals' websites does not create itself; it is designed by humans acting
on the hospitals' behalf.  Indeed, the
hospitals do not argue to the contrary.  
In
short, the hospitals' websites are, by design, the hospitals' "voice"
to the public and to patients on the Internet; to interact with the hospitals
in this forum, patients, inter alia, direct their web browsers to launch the
hospitals' websites, click on hyperlinks related to the information they seek,
type in search terms to garner more information, select filters or enter
searches to identify doctors, or fill out forms to request an appointment or to
reserve a spot in the urgent care line. 
Thus, like dialing the hospitals' main telephone number on a telephone
keypad to enter the signals required to call the hospital, talking into the handset,
and then being directed to a customer service representative to find, for
example, the closest physician of a particular gender who specializes in
fertility issues, the website fields that same "call" from Internet
users.[19] 
The
court's conclusion that the communications alleged by Vita are "with the
websites" is no more supportable than a conclusion that a communication
conducted by dialing a hospital's telephone number on a keypad is "with a
telephone."  Both sets of communications
are with the hospitals, regardless of how the technological advance connects
patients to the hospitals; both are encompassed by the phrase "any
communication."[20] 
b.  Personal communications.  The hospitals posit that Vita's complaints
merely describe the recording of her "movements in digital space,"
not exchanges of information.  For its
part, the court concludes that Vita's "browsing activities" were not
"personal."  Ante at
   .  These arguments
misapprehend the crux of Vita's claims.  
Her
claims do not center on the tracking of the Cartesian coordinates or pixel
locations on her electronic device's screen where she moved her cursor and
"clicked," or the keyboard strokes she entered as she typed words
into the hospitals' website search engines. 
Instead, her claims rest principally on the personal information
exchanged between her and the hospitals. 

That
information comprised, inter alia, the particular type of healthcare
information that Vita sought and that the hospitals provided on the webpages to
which she was directed in response to her inquiries; the search terms she typed
into the hospitals' website search bars to garner information regarding her and
her husband's medical conditions, symptoms, and treatment, and the hospitals'
responses to the same; her inquiries as to the hospitals' available physicians
based on gender preferences, geographic limitations and specialization, and the
hospitals' answers listing the physicians that fit her criteria and the types
of maladies in which they specialized; the specific providers with whom she
sought medical services; her intent to pay or view a medical bill; and her
requests to schedule appointments or be seen by an urgent care provider.
Indeed,
the value of the information that the hospitals allegedly assisted the
third-party software providers secretly to record lies presumably in the rich
portrait of Vita garnered from the treasure trove of information Vita and the
hospitals exchanged during her interactions with the hospital websites.  Recasting these exchanges as mere "digital
movements," as the hospitals do, or concluding that they involve no
"personal" information, as the court does, ignores the reality of the
information that the hospitals assisted third-party software providers to track
secretly.[21]  As described in the
complaint, the hospitals allowed the third-party software providers to be
"silent third-part[ies] watching whatever [Vita was] doing."  Assuming arguendo that the act includes an
unstated requirement that the communication secretly recorded is a
"personal" one, Vita's allegations meet it.         
c.  Prior determination of act's scope.  The court asserts that an amendment to the
act is required to capture the interception that occurred here in order for our
State act to mirror the breadth of the Federal wiretap statute, 18 U.S.C.
§§ 2510 et seq.  But we previously
have concluded that our State act's protections of "communication[s]"
is coextensive with the Federal counterpart without amendment; we explained
that, even unamended, our act extends to "non-oral electronic
transmissions" covered by the Federal counterpart as "electronic
communications" -- a category of protected communications that Congress
added in connection with the amendments to the Federal act as part of the
Electronic Communications Privacy Act of 1986 (ECPA), Pub. L. No. 99–508, 100
Stat. 1848 (1986).[22]  Moody, 466 Mass.
at 208.  See id., quoting Dillon v.
Massachusetts Bay Transp. Auth., 49 Mass. App. Ct. 309, 315 (2000) ("The
fact that there has been no amendment of the Massachusetts [wiretap] statute
comparable to the Congressional action of 1986 does not bar us from reading the
[Massachusetts wiretap statute] so as to preserve it in its intrinsic intended
scope and maintain its viability in the broad run of cases . . .").  
Today,
the court reverses course.  It states
that our holding in Moody was based on the ground that text messages mirror
person-to-person conversations by telephone or messages by telegraph.  Ante at    .  But this was not the basis for our holding in
Moody.  Instead, that decision was
grounded in our conclusion that the State act was as expansive as the amended
Federal counterpart, a necessary element of our analysis of the defendant's
argument that the State act was otherwise preempted by the Federal act.  In so holding, we relied on the definition of
wire communication extending to "any communication" as well as the
State act's use of the term "record." 
Moody, 466 Mass. at 208-209.  We
did not rely, as the court now states, on whether a human was directly on
either side of a text message.  See
generally id.  Critical to our decision
that text messages were covered by "wire communication" was our
determination that that term encompassed "non-oral electronic
transmissions" covered by the Federal counterpart.  Id. at 208. 
Given
our prior determination in Moody, it is significant that the court concludes,
as have some Federal courts, that under the Federal statute, third-party
interceptions that occur in the course of a user's interactions with a website,
like those alleged in Vita's complaints, are prohibited recordings of protected
communications.  See, e.g., In re
Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 596, 608 (9th Cir.
2020), cert. denied sub nom. Facebook, Inc. v. Davis, 141 S. Ct. 1684
(2021) (plaintiffs stated claim under Federal wiretap act where Facebook
installed "plug-in" software that collected uniform resource locator
[URL] information, which "provides significant information regarding the
user's browsing history, including the identity of the individual [I]nternet
user and the web server, as well as the name of the web page and the search
terms that the user used to find it"); In re Pharmatrak, Inc., 329 F.3d 9,
18 (1st Cir. 2003) (defendant who collected information on customers through
"cookies"[23] "appropriate[ly]" did not contest
"whether it . . . obtained the contents of an electronic
communication" under Federal wiretap act).[24] 
Consistent
with our decision in Moody and the decisions of Federal courts interpreting the
Federal counterpart, the term "communication" includes online
exchanges of medical information between a hospital and its patients by means
of the hospitals' website.  As we have
recognized, the Legislature chose to enact a statute that was more protective
than the Federal counterpart and comparable statutes in other States,[25]
rejecting proposals that would narrow protections.[26]  See Hyde, 434 Mass. at 599 ("The
commission [charged with restructuring the Commonwealth's wiretap statute]
clearly designed the 1968 [wiretap act] to create a more restrictive electronic
surveillance statute than comparable statutes in other States").  
d.  Absurdity. 
Notably, although the court's decision rests on its determination that
"communication" is an ambiguous term and although the court uses that
determination to justify its application of the rule of lenity, the court
relies on several cases concluding that the act is not ambiguous, but instead
literally reads on certain conduct.  Ante
at   . 
Setting aside this analytical misstep, I agree with the court that, in
the cited cases, we have eschewed the literal construction because doing so
resulted in an absurdity unsupported by the legislative goals of the act.  Cf. Commonwealth v. Morris, 492 Mass. 498,
505-508 (2023) (act does not require suppression of audiovisual recording of
voluntary statement where defendant knew police were recording his statement in
writing); Rainey, 491 Mass. at 642-644 (no suppression of body-worn camera
recording of witness's statement where witness called police to report assault
by defendant and knew her statement was being recorded in writing);
Commonwealth v. Gordon, 422 Mass. 816, 832-833 (1996) (act did not require
suppression of purely administrative booking video recording where it was not
used as investigative tool).  
However,
these cases do not control our analysis here. 
Given the Legislature's focus on the threat to personal privacy
occasioned by the use of modern electronic devices to surveil surreptitiously
individuals' communications, see G. L. c. 272, § 99 A, I
disagree with the court's implicit determination that the Legislature would
regard as absurd holding hospitals liable when they misstate how communications
between a patient and her healthcare providers would be used and shared with
third parties.    
Consistent
with its plain meaning as well as the context of the statutory framework as a
whole, the meaning of "communication" extends to the exchange of
medical information and knowledge, through speech,[27] writing, mechanical or
electronic media, or equivalent means.   
e.  Contents. 
Significantly, the court confuses the act's protections of the
"contents" of a communication with the "communication"
itself.  As discussed supra, the
complaints allege that the hospitals assisted third parties to record detailed
personal information exchanged between the hospitals and their patients.  The act prohibits the secret recording of
these communications, but it also protects their "contents," a term
defined as "any information concerning the identity of the parties to [a]
communication or the existence, contents, substance, purport, or meaning of
that communication."  G. L.
c. 272, § 99 B 5.  Thus, the
"contents" impermissibly recorded included Vita's underlying
communications with the hospitals as well as, inter alia, the existence of the
communications, the URLs of the specific webpages she visited, the titles of
the webpages through which she scrolled, the hyperlinks on which she clicked,
data about her web browser configuration, the unique identifier used to track
individuals across the website, and her Internet protocol address.[28]
The
court states that these latter "activities" do not resemble
person-to-person conversations.  Ante at
   .  Regardless, they are
"information concerning the identity" of Vita and "the
existence" of the communications. 
As such, they are protected as "contents" of the underlying
communication.  G. L. c. 272,
§ 99 B 5.
3.  Interception. 
Concluding that Vita did not allege any communication, the court does
reach the question whether an interception occurred.  The hospitals contend that Vita's complaints
failed to allege that she did not know that third parties were monitoring and
recording the communications over the hospitals' websites, and that therefore
no interception of her communications occurred.[29]  More specifically, the hospitals assert that
Vita had actual knowledge of the recordings because their privacy policies
stated, "We and our Third Party Service Provider collect and save the
default information customarily logged by worldwide web server software."[30]

The
argument ignores the assurances also set forth in the hospitals' privacy
policies that information on user activity "is not shared with other
organizations" and that "we will not share any information we receive
with any outside parties."[31]  See
In re Pharmatrak, Inc., 329 F.3d at 21 ("Deficient notice will almost
always defeat a claim of implied consent").  Moreover, Vita alleges that tracking software
was invisible to the average website user and not otherwise apparent to her.[32]  These allegations plausibly suggest that Vita
was unaware that the hospitals were assisting others to record the contents of
the information she exchanged with the hospitals over their websites.
The
hospitals also maintain that no interception transpired because "[i]t is
common knowledge in the 2020s that websites cannot follow users' browsing
commands without logging (i.e., 'recording') them[ and] [t]hat is how the
[I]nternet inherently works."  Under
the hospital's theory, "every online communication would provide consent
to interception by a third party." 
In re Pharmatrak, Inc., 329 F.3d at 21. 
To defeat a wiretap act claim, however, the aggrieved party must have
had actual knowledge of the recording. 
See Jackson, 370 Mass. at 507. 
While the actual knowledge may be express or implied, constructive
knowledge is insufficient.  See id.  Cf. In re Pharmatrak, Inc., supra at 19
("Consent may be explicit or implied, but it must be actual consent rather
than constructive consent"); Williams v. Poulos, 11 F.3d 271, 281 (1st
Cir. 1993) ("Implied consent is not . . . constructive
consent").  Here, nothing in the
complaints' allegations, which we must accept as true at this stage in the
proceedings, suggests that Vita had actual knowledge that third parties were
tracking her activities.  See Six Bros.,
Inc., 493 Mass. at 618.
The
court's refusal to conclude that Vita has alleged "any communication"
with the hospitals over their websites appears driven in large part by the
potential exposure of other website owners who employ web analytics -- tracking
software that monitors how users interact with a website to improve its
delivery of information.  Ante at
   .  Of course, if those
website owners candidly disclosed such tracking, then the recording would not
be secret and thus would not fall within the scope of the prohibited
interceptions.[33]  The act prohibits
secret recordings, not disclosed ones.[34] 
Curtatone, 487 Mass. at 658 ("the definition of interception
provided in the act requires that an interception of the type prohibited must
be [1] secretly made and [2] without prior authority by all parties"
[quotation and citation omitted]). 
G. L. c. 272, § 99 B 4 (interception occurs
only where hearing or recording is "secret").  Here, however, the hospitals' disclosures are
not forthright;[35] together with Vita's asserted lack of knowledge, the
disclosures do not provide a defense that can be determined at this stage of
the litigation.
4.  Ordinary course of business exception.  Because the court concludes that no
communications occurred between the hospitals and Vita, it does not reach the
hospitals' contention that the tracking software falls within an exception to
the prohibition on "intercepting device[s]"[36] that applies to
"any telephone or telegraph instrument, equipment, facility, or a
component thereof" that the hospitals used "in the ordinary course of
[their] business."  G. L.
c. 272, § 99 B 3.  
To
be sure, the act prohibits only interceptions that are conducted through an
"intercepting device." 
G. L. c. 272, § 99 B 4.  An intercepting device is
"any device
or apparatus which is capable of transmitting, receiving, amplifying, or
recording a wire or oral communication other than . . . any telephone
or telegraph instrument, equipment, facility, or a component thereof,
. . . furnished to a subscriber or user by a communications common
carrier in the ordinary course of its business under its tariff and being used
by the subscriber or user in the ordinary course of its business
. . ." (emphases added).
G. L.
c. 272, § 99 B 3. 
Thus, certain telephone or telegraph equipment used in the ordinary
course of business is exempted from the definition of an intercepting
device.  The hospitals do not contend
that the tracking software is "telephone or telegraph
equipment."  See O'Sullivan v. NYNEX
Corp., 426 Mass. 261, 265 (1997), quoting Commonwealth v. Todisco, 363 Mass.
445, 452 (1973) ("'telephone equipment' does not include eavesdropping
devices external and extraneous to regular telephone devices").  They ask us to construe "telephone and
telegraph instrument" to include the tracking software at issue here.  But the Legislature chose to limit expressly the
exception to "any telephone or telegraph instrument."  This contrasts sharply with the Legislature's
decision to define "wire communication" expansively to include
technologies beyond telephone and telegraph instruments.  Compare G. L. c. 272,
§ 99 B 3, with G. L. c. 272, § 99 B 1
("wire communication" extends to communications over "wire,
cable, or other like connection"). 
See Commonwealth v. Williamson, 462 Mass. 676, 682 (2012) (Legislature's
choice of different words demonstrates intent for different meanings).
Moreover,
Vita's complaints aver that the hospitals' ordinary course of business is
caring for and treating patients; it does not appear to extend to permitting
third parties to exploit communications between a patient and the hospitals
concerning the patient's medical inquiries, physicians, and medical care.  See Crosland v. Horgan, 401 Mass. 271, 275
(1987), quoting Watkins v. L.M. Berry & Co., 704 F.2d 577, 582 (11th Cir.
1983) ("in light of the statutory purpose of protection from invasions of
privacy, neither the concept of legitimate business purpose nor 'ordinary
course of business' can 'be expanded to mean anything that interests a
company'").  
5.  Conclusion. 
In sum, the hospitals created websites to communicate with their
patients, inviting patients to share their personal medical needs and, in turn,
providing the hospitals' responses.  The
hospitals assured patients that these exchanges of information would be kept
confidential.  Then, unbeknownst to
patients, they implanted tracking code to assist third parties to record the
patients' private medical concerns, padding Facebook's and Google's bottom
lines.  The court decides that the
wiretap act provides no recourse despite its prohibition on surreptitious
electronic surveillance by private parties. 
Lamentably, the court is right about one thing; the Legislature will
need to correct today's error.

footnotes

[1] Individually
and on behalf of all others similarly situated.

[2] Kathleen Vita
vs. Beth Israel Deaconess Medical Center, Inc.

[3] We
acknowledge the briefs of amici curiae Chamber of Commerce of the United States
of America; Greater Boston Chamber of Commerce and Massachusetts Nonprofit
Network; Doe plaintiffs in other pending civil actions; Massachusetts Health
and Hospital Association, Inc., and Massachusetts Medical Society; National
Retail Federation and Retailers Association of Massachusetts; National Consumer
Law Center, Inc., and Electronic Privacy Information Center, Inc.; New England
Legal Foundation and Associated Industries of Massachusetts; and Pioneer Public
Interest Law Center.

[4] While the
dissent refers broadly to interception of "private healthcare
information," post at    , there is
no allegation that information contained within the private patient portals was
accessed or shared.   

[5] As described
in the complaint against BIDMC:   
"A 'URL' is
another form of an address specifically for websites . . . that a web
browser can translate into an [Internet protocol (IP)] address to load the website. . . .  Numerous URLs also point to specific pages on
that website; often, a URL will contain information about the particular
webpage itself."

[6] Vita's complaints explain that "[a]n 'IP address' is a unique
combination of . . . numbers . . . that serves as a
particular device's address on the [I]nternet."

[7] This was
allegedly collected only on BIDMC's website, which implemented an optional
feature offered by Google Analytics.

[8] While Vita
alleges that users could book appointments and reserve spots in line to be seen
by an urgent care physician, nothing indicates that users could engage in
substantive written conversations or draft particularized messages to health
care providers using the forms.  Nor does
Vita allege that she herself used the form to request appointments.

[9] The software
on NEBH's site also would transmit the name of the user's doctor.

[10] As explained
in the briefing by both parties and the amicus submissions, such tracking is
commonly employed.  See Amended Opening
Brief for Defendants-Appellants, at 24-25; Brief for National Retail Federation
and Retailers Association of Massachusetts, as Amici Curiae, at 3 ("The
technologies at issue in this case are found on all manner of websites[] and play
a fundamental role in the modern digital economy . . .").  

[11] The
complaints do not allege whether Vita viewed the pop-up messages when she
accessed the webpages or whether she reviewed the privacy policies.  The complaints also do not allege how or when
the pop-up messages first appeared to a user navigating the websites.

[12] A domain
name, as defined in the privacy policies, is "the unique address assigned
to your Internet service provider's computer that connects to the
Internet."

[13] No class had
been certified by the time these cases reached this court.  There has also been no other plaintiff
identified.  Based on our decision today,
we need not address whether the prerequisites of class certification, including
whether Vita is an appropriate class representative, may be satisfied
here.  See Mass. R. Civ. P. 23, as
amended, 471 Mass. 1491 (2015).  

[14] The dissent
claims we apply "a heightened pleading standard, or a premature analysis
of whether Vita is an appropriate class representative."  Post at    .  We do not. 
As we note infra, we need not and do not decide whether Vita is an appropriate
class representative, although we are cognizant that she is the only class
representative identified and her personal claims are quite limited.  Although we do not ignore Vita's allegations
as to what users in general did on the websites, we do not, as the dissent
does, embellish those allegations or her own. 
See, e.g., notes 4, 8, supra; notes 21, 22, infra.  As no class has been certified and Vita may
not be an appropriate class representative, we also make clear, where we can,
what she alleges she experienced and what unknown other members of a putative
class may allege.  If anyone is straining
pleading standards, it is the dissent.

[15] The act
defines an "aggrieved person" as "any individual who was a party
to an intercepted wire or oral communication . . . or who would
otherwise have standing to complain that his personal or property interest or
privacy was invaded in the course of an interception."  G. L. c. 272,
§ 99 B 6.  

[16] As discussed
supra, the complaints outline various other claims presented on the behalf of
currently unnamed members of the purported class.  Because there are no other named plaintiffs
in these cases, Vita's individual standing is particularly important.  Cf. Gammella v. P.F. Chang's China Bistro,
Inc., 482 Mass. 1, 20 (2019) (recognizing that whether plaintiff's claim was
moot was "particularly important . . . because no other named plaintiff
[had] yet been identified").  As we
conclude that Vita has standing regarding her claims, however, we need not
decide whether she would independently have standing to pursue other claims on
behalf of the class.  Contrast Weld v.
Glaxo Wellcome Inc., 434 Mass. 81, 84 (2001) (class representative lacked
standing where he had suffered no individual injury). 

[17] The same
punishments apply to anyone who "attempts to commit an interception, or
procures any other person to commit an interception or to attempt to commit an
interception."  G. L. c. 272,
§ 99 C 1.

[18] The dissent
emphasizes the word "any" that accompanies the definition of
"wire communication," asserting that the use of "any" to
modify "communication" evinces a clear legislative intent to
"provide sweeping protection for communications of whatever kind"
(quotation and citation omitted).  Post
at   . 
See G. L. c. 272, § 99 B 1.  The
problem with this analysis, as explained supra, is that the term "wire
communication" does not itself define the meaning of
"communication," but rather the means of communication.  We need to look to a source beyond the
definition of "wire communication" to understand what
"communication" means.  Indeed,
the dissent does this by turning to dictionaries for its interpretation of
"communication."  We address
the problems with the dissent's dictionary analysis infra. 

[19] According to
the dissent, these references to "telephone" and
"telegraph" are just examples of the Legislature explicitly limiting
a provision of the act to a particular type of communication.  The act requires that warrant applications
include a statement "[t]hat the oral or wire communications of the
particularly described person . . . will occur . . . over particularly
described telephone or telegraph lines" (emphasis added).  G. L. c. 272, § 99 F 2 c.  Similarly, a warrant must include "[a]
particular description of the person and the place, premises or telephone or
telegraph line upon which the interception may be conducted" (emphasis
added).  G. L. c. 272, § 99 I
3.  It is not clear why the Legislature
would want to limit the warrant requirements to telegraph or telephone lines as
opposed to other types of wired communications.

[20] A
conversation is an "oral exchange of sentiments, observations, opinions,
or ideas," and includes a similar exchange conducted by, for example,
e-mail.  Merriam-Webster Online
Dictionary, https://www.merriam-webster.com/?dictionary/conversation
[https://perma.cc/EL4B-75K2].

[21] The dissent
claims we rely on Vita's allegations that she communicated with the hospitals'
websites but ignore places in the complaints where she characterizes the
communications as between users and the hospitals.  But there is nothing in the allegations to
suggest that anything other than interactions with the website are at issue
here.  When the complaints reference
communications with the hospitals, they are only referencing communications
with the hospitals' websites.  As
discussed supra, there is a significant difference between communicating with a
person and communicating with a website, a difference the dissent fails to
grasp.  According to the dissent, there
is no meaningful difference between speaking to a doctor about one's specific
illness and searching for, and then reading, pre-generated content on a webpage
discussing an illness in general.  There
is a difference in kind and not degree between the two as we explain throughout
the opinion.  One is interpersonal, the
other is not.

[22] The dissent
says we "misapprehend[] the hospitals' websites as repositories for
'published,' 'pre-generated' medical data," and contends that the websites
were in fact "confidential dynamic forums on which [the hospitals]
communicated 'interactive[ly]' with patients about the patients' 'personal'
medical needs."  Post at
   .  We disagree with the
dissent's characterization.  Nothing in
the complaints indicates that the hospitals provided specific, tailored
responses in real time to users' inquiries. 
As alleged here, the content was no more dynamic than that contained on
any other website that provides written content that is periodically
updated.  Nor do the complaints describe
hospital websites that are more interactive than most institutional webpages
that provide general information.  Users
had the ability to navigate and find information relevant to themselves and to
schedule appointments, but nothing in the complaints indicates that, at least
where third-party tracking was active on the websites, users could engage in
one-on-one interactions with specific medical providers.

[23] The dissent
claims we disregard the dictionary definitions of
"communication."  We do
not.  "Dictionaries can be useful in
interpreting statutes, but judges . . . must take care not to 'overread' what
dictionaries tell us" (citation omitted). 
Suesz v. Med-1 Solutions, LLC, 757 F.3d 636, 643-644 (7th Cir.), cert.
denied, 574 U.S. 1047 (2014). 
"Although . . . dictionaries can be helpful -- especially when dealing
with a specialized term, or a term of art, or a word's usage at the time of the
law's enactment -- more often than not, the interpretive challenge comes from
the ambiguity of the word as situated in a sentence.  In that situation, dictionaries can hardly be
definitive."  R.A. Katzmann, Judging
Statutes 43 (2014).  Here, the dictionary
definitions are too varied and "too vague to provide meaningful
guidance."  Suesz, supra at
643.  In everyday language and in other
legal contexts, "communication" can ordinarily imply an interpersonal
exchange, such as a conversation or exchange of messages.  See, e.g., Clair v. Clair, 464 Mass. 205, 213
(2013) (determining whether testimony and documents sought were privileged
attorney-client communications); Phelan v. May Dep't Stores Co., 443 Mass. 52,
56 (2004) ("communication" for defamation purposes defined as
"conduct that brings an idea to the perception of others" [citation
omitted]); Emerson, 8 Ways You Can Improve Your Communication Skills, Harvard
Division of Continuing Education (Aug. 30, 2021),
https://professional.dce.harvard.edu/blog/8-ways-you-can-improve-your-communication-skills
[https://perma.cc
/P4RD-WN75]
("A leader's ability to communicate clearly and effectively with
employees, within teams, and across the organization is one of the foundations
of a successful business").  

[24] See, e.g.,
American Heritage Dictionary of the English Language 269 (1970) ("The
exchange of thoughts, messages, or the like, as by speech, signals, or
writing"); Random House Dictionary of the English Language 298 (1967)
("the imparting or interchange of thoughts opinions, or information by
speech, writing, or signs").

[25] We also note
that most of the preamble is directed at the dangers presented by organized
crime and the need for its secret surveillance, albeit under tight
controls.  See G. L. c. 272,
§ 99 A ("[O]rganized crime constitute[s] a grave danger to the
public welfare and safety. . . .  [L]aw
enforcement officials must be permitted to use modern methods of electronic
surveillance, under strict judicial supervision, when investigating these
organized criminal activities").
          26 We note that oral communication
expressly excludes speech "transmitted over the public air waves by radio
or other similar device."  G. L. c.
272, § 99 B 2.

[28] The dissent
accuses us of confusing the act's protection of the "contents" of a
communication with the "communication" itself.  Post at  
.  The wiretap act defines
"contents" as "any information concerning the identity of the
parties to such communication or the existence, contents, substance, purport,
or meaning of that communication." 
G. L. c. 272, § 99 B 5.  The
problem is that "contents," while referencing
"communication," does not define the term.  Moreover, the definition refers to
"parties to such communication." 
This only reinforces the ambiguity of the definition of communication,
as "parties" seems to suggest the existence of at least two
individuals (i.e., two parties to a telephone call or two parties to a text
message thread).  See Merriam-Webster
Online Dictionary, https://www
.merriam-webster.com/?dictionary/party
[https://perma.cc/2K4N-XPPE] ("party" can be defined as "a
particular individual" or "a person or group participating in an
action or affair").  Accordingly,
where the meaning of "communication" is ambiguous, we cannot say with
any more confidence that the information described by the dissent (e.g., URLs,
titles of webpages, hyperlinks, etc.) is "contents" of a communication
also protected by the wiretap act.

[29] As noted
earlier, speech "transmitted over the public air waves by radio or other
similar device" was expressly excluded. 
G. L. c. 272, § 99 B 2.

[30] The act
allows "an operator of a switchboard, or an officer, employee, or agent of
any communication common carrier, whose facilities are used in the transmission
of a wire communication, to intercept, disclose, or use that communication in
the normal course of his employment." 
G. L. c. 272, § 99 D 1 a.  It also allows "a financial institution
to record telephone communications with its corporate or institutional trading
partners in the ordinary course of its business."  G. L. c. 272, § 99 D 1 f.

[31] The dissent
declares that we commit an "analytical misstep" in looking to cases
where we interpreted the wiretap act and did not find it ambiguous, but
nonetheless rejected certain literal readings. 
Post at    .  We
are unaware of any rule, nor does the dissent cite one, requiring that -- in determining
whether a statute is ambiguous -- we only rely on cases where that same statute
was declared ambiguous.  Based on our
citation of those same cases, the dissent further asserts that we must
determine that "the Legislature would regard as absurd" the
application of the wiretap act to the alleged website activities.  Id. at    .  The dissent is incorrect.  Where the statute's definition of
communication clearly applies, we still consider whether its application is
absurd.  See Commonwealth v. Mansur, 484
Mass. 172, 175 (2020) (statute's language must be given its ordinary meaning if
language is "clear and unambiguous"; however, "we do not adhere
blindly to a literal reading of a statute if doing so would yield an 'absurd'
or 'illogical' result" [citations omitted]).  In the instant cases, however, as we have
explained throughout this opinion, the term "communication" does not
clearly apply here.  Rather, it is ambiguous.

[32] The dissent
claims that we misread Moody, ignoring its conclusion that the "State act
was as expansive as the amended Federal counterpart."  Post at    .  According to the dissent, Moody stands for
the proposition that our wiretap act covers all forms of communication covered
by the Federal wiretap act, Title III of the Omnibus Crime Control and Safe
Streets Act of 1968, Pub. L. No. 90–351, 82 Stat. 211 (1968) (Title III), as
amended, including all forms of electronic communication as that term is
defined by Title III.  Post at    .  The dissent is incorrect.  Moody is, of course, a more nuanced
decision.  There, the court concluded
only that the wiretap act, on "the several particulars challenged by the
defendants, is not repugnant to the provisions of the Federal act and is accordingly
not preempted" (emphasis added; citation omitted).  Moody, 466 Mass. at 205.  More particularly, the court concluded the
"existing language of the Massachusetts wiretap statute is broad enough to
protect all forms of cellular telephone calls that utilize wire, cable, or
other like connections, even if the use of such connections is only in
switching stations."  Id. at
207.  In this respect, the court found
"the Massachusetts wiretap statute is as protective as the amended Federal
wiretap statute."  Id.  To reach this conclusion, the court did not
need to determine whether our State wiretap act protected every type of
communication protected by the amended Title III, because the limited question
before the court was whether cell phone calls and text messages were protected.        

[33] Vita also
cites Federal court opinions, most of them unpublished, interpreting other
States' wiretap statutes and concluding that the statute applies to
communications between a website and a user. 
To the extent some of the cases involve similar fact patterns, these
cases interpret different State laws; also, those State laws have been amended
far more recently than our wiretap act. 
See, e.g., Cal. Penal Code § 632.01, inserted by Cal. Stat. 2016,
c. 855 (A.B. 1671) (crime to intentionally disclose or distribute,
"in any forum, including . . . Internet Web sites
. . . the contents of a confidential communication with a health care
provider" that is illegally intercepted); 18 Pa. Cons. Stat. § 5704,
as amended through 2017 Pa. Legis. Serv. Act 2017-22 (S.B. 560)
("telephone calls" and "conversations" in wiretap act
replaced with "oral communication, electronic communication, or wire
communication").

[34] Indeed, we
have explicitly applied the rule of lenity to civil statutes with no criminal
component if the statutory provision was penal in nature.  See Anderson v. National Union Fire Ins. Co.
of Pittsburgh PA, 476 Mass. 377, 386 (2017) (applying rule of lenity to treble
damages provision of civil statute, G. L. c. 93A); Libby v. New York, N.H.
& H.R.R., 273 Mass. 522, 525-526 (1930) (statute providing civil damages
for injuries caused by railroad collisions "must be construed strictly and
not extended by equity, or by the probable or supposed intention of the
[L]egislature as derived from doubtful words" [quotation and citation
omitted]).

[35] The dissent
attempts to narrow the application of Vita's interpretation to the collection
of medical information.  But it fails to
explain why such browsing is communication when one browses a public medical
website, as opposed to browsing any other type of public website.  The statute certainly draws no such
distinction.  It is not specifically
directed at medical information as opposed to any other information.  

[36] The dissent
claims we are motivated in our reasoning by "business
realities."  Post at note 33.  To be sure, we do not ignore "business
realities," as courts should, of course, take care to consider the
real-world application of a proposed reading of a statute.  But the principle guiding our analysis is,
more simply, adherence to the rule of lenity where a criminal statute is
ambiguous.  Unlike the dissent, we will
not impose penalties of up to five years in prison on activity that has not
been clearly defined to be criminal.

[37] Vita also
does not allege that her or her husband's private medical records, that is,
medical information prepared by doctors, nurses, or physician assistants for
either of them, were transmitted to third parties without their consent.

footnotes for dissenting

[1] For example,
the court recognizes that the websites were used by a patient to communicate
requests to the hospitals to book appointments and to reserve a spot in the
urgent care line, but then places significance on Vita's purported failure to
allege whether "users could engage in substantive written conversations or
draft particularized messages to health care providers using the
forms."  Ante at note 8.  It is not clear why or whether that
additional allegation would affect the court's analysis.  Certainly, nothing in the act itself requires
a communication to be particularly "substantive" or
"particularized" to warrant protection.  As discussed infra, the act protects
"any communication." 
G. L. c. 272, § 99 B 1.

[2] As discussed
in detail infra, the act makes clear that the "contents" of a
communication include more than the communication itself; it defines
"contents" as "any information concerning the identity of the
parties to [a] communication or the existence, contents, substance, purport, or
meaning of that communication." 
G. L. c. 272, § 99 B 5.  

[3] Rather than
start its analysis with this trusted resource, the court takes an unusual
approach, searching the act for "examples" of communications and then
declaring that in light of this sampling, the dictionary definitions are
"too varied and too vague" to be useful (quotation and citation
omitted).  Ante at note 23.  I disagree. 
The definitions provided by the dictionaries are neither too varied nor
too vague; central to each is the exchange of information and knowledge.  And, as explained infra, the samples relied
on by the court comprise a subset of the broader definition of
"communication."

[4] The term
"conversation" means an "oral exchange of sentiments, observations,
opinions, or ideas," and includes a similar exchange conducted by, for
example, e-mail.  Merriam-Webster Online
Dictionary, https://www.merriam-webster.com/?dictionary/conversation
[https://perma.cc/EL4B-75K2].  Thus, a
"conversation" is encompassed by the term "communication";
however, the term "communication" is broader.  Cf. Commonwealth v. Zezima, 365 Mass. 238,
241 (1974) ("The adoption by the Legislature of the word 'communication'
[and not 'conversation'] . . . manifests an intention to include
more than conversations . . .").

[5]
"[N]early everything that makes the [I]nternet function is
wired. . . .  Individual
devices like laptops and smartphones are capable of communicating with a
network (Wi-Fi or cellular network), but the routers that they connect to are
almost always connected by wires." 
Alliance for Innovation and Infrastructure, The Infrastructure of the
Physical Internet (June 27, 2023), https://www.aii.org/the-infrastructure-of-the-physical-internet
[https://perma.cc/S6DL-EU2K].  See In re
DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d 497, 501 (S.D.N.Y. 2001)
("The Internet is the physical infrastructure of the online world:  the servers, computers, fiber-optic cables
and routers through which data is shared online").  See also Commonwealth v. Moody, 466 Mass.
196, 198, 207 (2013) (wiretap act applies to wireless transmissions between
cellular telephones because transmissions "utilize wire, cable, or other
like connections, even if the use of such connections is only in switching
stations").  

[6] After
reframing Vita's alleged exchanges of information over the hospitals' websites
as "web browsing," the court casts aside dictionaries because they do
not provide a "ready answer" to the question whether web browsing is
"with the website" or "with the website's owner."  This sleight of hand does render dictionaries
unhelpful in our analysis of the meaning of the term "communication,"
especially where the term is preceded by the word "any," as discussed
infra.  In any event, the information on
the website did not come from the ether; the information was supplied by
individuals –‑ representatives of the hospitals responsible for the websites'
content.  Accordingly, the communications
alleged to have occurred here were between the hospitals and their patients by
means of the hospitals' websites.  See
discussion infra.

[7] See, e.g.,
Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121, 124 (3d Cir. 2022) (referring
to consumer's interactions with website as "communications"); In re
Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 596, 607-608 (9th Cir.
2020), cert. denied sub nom. Facebook, Inc. v. Davis, 141 S. Ct. 1684
(2021) (referring to "GET requests" between user's web browser and
webpage servers, which include uniform resource locator [URL] of webpage and
sometimes information about website from which user is launching new site, as
"communications"); In re Google Inc. Cookie Placement Consumer
Privacy Litig., 806 F.3d 125, 130 (3d Cir. 2015), cert, denied sub nom. Gourley
v. Google, Inc., 580 U.S. 814 (2016) (referring to Internet exchanges captured
by "cookies," which enable transfer of information from web browser
to web server, as "communications"); In re Zynga Privacy Litig., 750
F.3d 1098, 1101 (9th Cir. 2014) (describing how "communications occur
between [Internet] 'clients' and 'servers'" in context of Facebook cookies
transferring information); Brown v. Google LLC, 525 F. Supp. 3d 1049, 1068
(N.D. Cal. 2021) (referring to Internet exchanges captured by cookies as
"communications"); In re DoubleClick Inc. Privacy Litig., 154 F.
Supp. 2d at 504 (describing information exchanges between user and websites
captured by cookies as "communication[s]").  See also note 23, infra (defining
"cookie").

[8] Curiously,
the court dismisses dictionaries as unhelpful because "the interpretive
challenge comes from the ambiguity of the word as situated in [the]
sentence."  Ante at note 23.  Yet, the court refuses to consider the word
"communication" in context. 
Specifically, the use of the word in the sentence defining "wire
communication."

[9] The
Legislature expressly stated its understanding that technological advances
would change the ways we communicate.  In
describing the scope of wire communications, it chose the words "made in
whole or in part through . . . wire, cable, or other like connection
between the point of origin and the point of reception" to capture
communications conducted over future technologies, like the Internet (emphasis
added).  G. L. c. 272,
§ 99 B 1.  Faithful to that
forward-looking mandate, we previously have concluded that the wiretap act applied
to technologies that did not exist at the time of its enactment.  See Moody, 466 Mass. at 208-209 (concluding
"wire communication" includes cellular telephone calls, which only
transfer through wire, cable, or like connection briefly at switching stations,
as well as text messages, which are nonoral electronic communications). 

[10] Indeed, both
telegraph and Internet systems operate through transmission of electrical
signals, leading some commentators to view telegraphs as a sort of precursor to
the Internet.  See generally T. Standage,
The Victorian Internet:  The Remarkable
Story of the Telegraph and the Nineteenth Century's On-line Pioneers
(1998).  

[11] Of course,
"where[, as here,] the statute is clear and unambiguous, our inquiry into
the Legislature's intent need go no further than the statute's plain and
ordinary meaning" (citation omitted). 
Commonwealth v. Mcneil, 492 Mass. 336, 337 (2023).  AIDS Support Group of Cape Cod, Inc. v.
Barnstable, 477 Mass. 296, 301 (2017) ("Where the language of the statute
is plain and unambiguous, . . . legislative history is not ordinarily
a proper source of construction" [quotation and citation omitted]).   

[12] Contrary to
the hospitals' argument, our opinion in Commonwealth v. Rivera, 445 Mass. 119
(2005), is not to the contrary. 
Expressly passing over the question whether the owner who made the
recording violated the act, we concluded that suppression was not required
because the State had no part in ordering or encouraging the recording.  Id. at 123 ("we need not determine the
predicate issue . . . whether the audiotape was made in violation of
the wiretap statute").  We also
mused in dicta that "the defendant cannot reasonably claim that his
recorded threats and obscenities were a 'conversation'" that the act would
protect.  Id. at 127 n.10.  However, we did not (and could not) thereby
limit the scope of the act's protections to polite conversations.

[13] Of course,
there are differences between in-person communications, telephonic
communications, e-mail communications, text messages, and communications with
the hospitals conducted over a website. 
Each technology alters the way we communicate.  In some respects, the technological advances
are helpful, making it possible for us to communicate over distances previously
unthinkable or to place a message during nonbusiness hours seeking an
appointment with a healthcare provider for our ailing loved one.  In other ways, the technological advances can
detract from the qualities of direct in-person interactions.  However, the Legislature was clear that these
differences in how we communicate would not leave the information exchange
unprotected.  The act protects
"any" communications, even the ones that lack the personalized touch
of a bygone era, and even the ones that are less substantive than others.  

[14] Notably,
"we have turned repeatedly to the [wiretap] statute's preamble to inform
our analysis."  Rainey, 491 Mass. at
642, citing Curtatone, 487 Mass. at 659-660, Commonwealth v. Tavares, 459 Mass.
289, 295 & n.5 (2011), Commonwealth v. Ennis, 439 Mass. 64, 68 (2003),
Commonwealth v. Gordon, 422 Mass. 816, 833 (1996), and Commonwealth v. Thorpe,
384 Mass. 271, 279 (1981), cert. denied, 454 U.S. 1147 (1982).

[15] I disagree
with the court's conclusion that the Legislature, which was frightened by the
capacity of cigarette pack-sized "parasite bugs" and by "room
bugs" that could pick up a whisper from twenty feet away, ante at
   , would be less abhorred by "hidden code" secretly "injected"
into patients' home computers that enables observers to watch from anywhere
patients' healthcare communications on hospital websites, as Vita alleges.  

[16] The court
declares the "historic analogies" to "website analytics" to
be tracking of mail order purchasing decisions, compiling of customer lists,
and sharing the same.  Ante at
   .  But such manual
endeavors are not "modern electronic surveillance devices" with the
attendant capacity of such electronic devices to surpass what can be done
manually (emphasis added).  G. L. c. 272,
§ 99 A.  It thus is not
surprising that the Legislature did not discuss such basic manual business
activities.  By contrast, the tracking
software -- indisputably a form of modern electronic surveillance device --
alleged by Vita in her complaints falls within the Legislature's area of
concern.
      Notably, when it enacted the statute, the
Legislature was alarmed by the revelation that a telephone company was secretly
monitoring and recording telephone calls between customers.   Ennis, 439 Mass. at 69 n.10, citing 1967
Senate Doc. No. 1198, at 14.  Secret
monitoring of communications exchanged through a company's website is, in
material respects, a modern-day equivalent of a telephone company secretly
monitoring and recording customer's use of its landlines -- a practice that
particularly concerned the Legislature. 
See Ennis, supra, citing 1968 Senate Doc. No. 1132, at 6-7, and 1967
Senate Doc. No. 1198, at 14 (partial motivation for wiretap act was revelation
that telephone company was recording customers' calls secretly).

[17] One of the
Internet's most significant contributions has been to make possible
instantaneous communications across vast expanses.  As the United States Supreme Court described:   
"Anyone with
access to the Internet may take advantage of a wide variety of communication
and information retrieval methods.  These
methods are constantly evolving and difficult to categorize precisely.
. . .  All of these methods can
be used to transmit text; most can transmit sound, pictures, and moving video
images.  Taken together, these tools
constitute a unique medium -- known to its users as 'cyberspace' -- located in
no particular geographical location but available to anyone, anywhere in the
world, with access to the Internet."  

Reno v. American
Civil Liberties Union, 521 U.S. 844, 851 (1997).

[18] As described
supra, the fact that the hospitals' responses are, in some sense, pre-generated
is not dispositive; nothing in the act limits its protection of "any
communication" to spontaneous or extemporaneous communications.  Cf. Armata v. Target Corp., 480 Mass. 14,
19-20 (2018) (automatically dialed and delivered prerecorded telephone message
constituted "communication" under debt collection regulation).

[19] Accord
Revitch vs. New Moosejaw, LLC, U.S. Dist. Ct., No. 18-cv-06827-VC (N.D. Cal.
Oct. 23, 2019) ("request[ing] information . . . by clicking on items of
interest" and receiving that information in response is akin to
"call[ing] to inquire about a store's products," and "[t]his
series of requests and responses -- whether online or over the phone -- is
communication").  

[20] Deviating
from our standard of review on a motion to dismiss, which requires us to draw
all reasonable inferences in the plaintiff's favor, see supra, the court
appears to rely on Vita's characterization of her "intercepted
communications" as being between Vita and "each hospital's
website."  Ante at
   .  If Vita's
allegations are to be controlling, then, at the least on a motion to dismiss,
we must consider her numerous allegations describing the use of the website
features as communications with the hospitals. 
See, e.g., Vita vs. Beth Israel Deaconess Med. Ctr., Inc., Mass. Super.
Ct., No. 2384CV00480, Complaint ¶ 1 (Suffolk County Feb. 24, 2023) (BIDMC
Complaint) ("Plaintiff brings this action to remedy the secret
interception of the contents of [I]nternet communications between healthcare
consumers and the defendant, [BIDMC]. . . . 
The Plaintiff's and Class Members' wire communications with BIDMC were
secretly and contemporaneously intercepted, recorded, and transmitted to these
third parties without their knowledge or consent whenever they visited any page
of the BIDMC Website"); BIDMC Complaint ¶ 7 ("this case concerns
communications between healthcare consumers and healthcare providers");
BIDMC Complaint ¶ 9 ("BIDMC aided interceptions by . . . third
parties of healthcare consumers' communications with BIDMC through the BIDMC
Website"); BIDMC Complaint ¶ 18 ("Users of healthcare-related
websites such as the BIDMC Website have a legitimate expectation and
understanding that their communications with BIDMC through the website will be
private.  They also have a legitimate
expectation that healthcare providers such as BIDMC will not share with third
parties their communications with BIDMC without their consent"); BIDMC
Complaint ¶ 20 ("Healthcare consumers would not anticipate or expect that
their communications with healthcare providers, including BIDMC, which reveal
information about that individual's personal health conditions, will be
intercepted and secretly shared . . ."); BIDMC Complaint ¶ 25
("The interceptions of website users' communications with BIDMC were,
therefore, truly secret . . ."); BIDMC Complaint ¶ 26
("Plaintiff describes in this complaint various tracking technologies
implemented on the BIDMC Website that cause the secret interception, recording,
and transmission of the contents of Class Members' [I]nternet communications
with BIDMC.  The next section
. . . provides a brief overview of the third parties that intercept
and record the contents of Class Members' [I]nternet communications with BIDMC
. . ."); BIDMC Complaint ¶ 38 ("BIDMC injects hidden
code into the BIDMC Website that permits third parties to contemporaneously
intercept healthcare consumers' communications with
BIDMC. . . .  This
includes, for example, associating the content of the user's communications
with BIDMC with the website user's Facebook profile"); BIDMC Complaint ¶ 39
("These tracking technologies transmit to [third parties]
contemporaneously with the website communications between Class Members and
BIDMC, the contents of those communications and identifying information about
the Class Members"); BIDMC Complaint ¶ 50 ("A third party
. . . can then add the content of the user's communications with
BIDMC to its collection of information it already has about the individual,
which it can then use for advertising purposes"); BIDMC Complaint ¶ 52 ("The
tracking technologies described in this complaint intercept and transmit to
third parties the contents of communications between healthcare consumers and
BIDMC contemporaneously with those communications"); BIDMC Complaint ¶ 54
("These tracking technologies are each substantially similar to the
now-removed [third party] code, both in their surreptitious deployment on the
website and their contemporaneous interception of website users' communications
with BIDMC"); BIDMC Complaint ¶ 63 ("After [a third party] associates
the website user's communications with BIDMC with the identity of particular
individuals known to [the third party], [the third party] can use that
information for its own commercial purposes . . ."); BIDMC
Complaint ¶ 66 ("Below is an example of the contents of the communication
between the website user and BIDMC, which the hidden [code] would intercept and
transmit to [a third party]"); BIDMC Complaint ¶ 68 ("With that
information, [a third party] could then use the contents of communications
between the website user and BIDMC to serve personalized advertising to the
website user in the future") (Emphases added.).  The above is exemplary; other allegations are
the same and repeated with regard to NEBH.

[21] The tracking
software captured information about Vita's and her husband's medical conditions
and care.  As an example, Vita posited
that if she navigated to the hospitals' webpages concerning pregnancy
treatments, queried the websites with pregnancy-related search terms, requested
an appointment with the obstetrics department, entered the payment portal, or
accessed the patient portal, the data collected by the software could be
employed to discern that Vita or someone she knows was pregnant and was
receiving care from physicians affiliated with the hospitals.  In combination with other information known
about Vita, the third-party software providers thereafter could monetize this
information to sell and deliver targeted digital advertisements regarding
pregnancy or prenatal care to Vita.  

[22] The ECPA
narrowed the Federal wiretap act's definition of "wire communication"
from one that essentially was identical to our State wiretap act's definition
of "wire communication" by substituting the phrase "any aural
transfer" for "any communication," thereby limiting wire
communications under the Federal statute to those involving the human
voice.  Pub. L. No. 99–508,
§ 101(a)(1)(B), 100 Stat. at 1848, codified, as amended, at 18 U.S.C.
§ 2510(1).  See Moody, 466 Mass. at
202-203.  At the same time, however, the
ECPA defined a new category called "electronic communications," which
includes "any transfer of signs, signals, writing, images, sounds, data,
or intelligence of any nature transmitted in whole or in part by a wire, radio,
electromagnetic, photoelectronic or photooptical system" but not oral or
wire communications as redefined in the amended Federal act.  Pub. L. No. 99–508, § 101(a)(6)(B), 100
Stat. at 1848–1849, codified, as amended, at 18 U.S.C. § 2510(12).  See Moody, supra at 202.  The State act's definition of "wire
communication" has not changed and has not been narrowed to mirror the
Federal statute; it continues to cover "any communication" by the
requisite means.

[23] A cookie is
a data file received on a computer at the time that the computer's user visits
a webpage and is used to record and maintain information about the user's
online activity.  See U.S. Auto Parts
Network, Inc. v. Commissioner of Revenue, 491 Mass. 122, 125 & nn.6-8 (2022).

[24] Amici
Greater Boston Chamber of Commerce and Massachusetts Nonprofit Network contend
that Vita's website interactions are not protected, citing Federal cases
concluding that "contents" of a communication were not intercepted
where recorded URLs did not "convey substantive information" but
instead conveyed "mere dialing, routing, addressing, or signaling
information" (quotation and citation omitted).  In re Nickelodeon Consumer Privacy Litig.,
827 F.3d 262, 275 (3d Cir. 2016), cert. denied sub nom. C.A.F. v. Viacom Inc.,
580 U.S. 1048 (2017).  The Federal
statute, however, defines "contents" of a communication as only
"any information concerning the substance, purport, or meaning of that
communication."  18 U.S.C.
§ 2510(8).  By contrast, our State
counterpart defines "contents" to include "any information
concerning the identity of the parties to such communication or the existence,
contents, substance, purport, or meaning of that communication" (emphases
added).  G. L. c. 272,
§ 99 B 5. 

[25] Courts
interpreting other States' wiretap acts also have concluded that their State
act applies to communications transmitted over websites on the Internet.  See, e.g., Popa, 52 F.4th at 133
(Pennsylvania's wiretap statute, which models Federal wiretap statute,
protected consumer's browsing activities on website); Javier vs. Assurance IQ,
LLC, U.S. Ct. App., No. 21-16351 (9th Cir. May 31, 2022) ("Though written
in terms of wiretapping, [§ 631(a) of California's statute, which, like the
Commonwealth's act, does not separately define electronic communications,]
applies to Internet communications"); Smith vs. Google, LLC, U.S. Dist.
Ct., No. 23-cv-03527 (N.D. Cal. June 3, 2024) (denying motion to dismiss claim
under California wiretap statute where third-party tracking tools recorded
information exchanges through website). 
See also McCulley vs. Banner Health, U.S. Dist. Ct., 23-cv-00985 (D.
Ariz. May 10, 2024) (sustaining claim for violation of California wiretap
statute where healthcare provider enabled third parties to record search terms
plaintiff used to research "specific doctors and medical
treatments").  

[26] For example,
unlike many other States' wiretap statutes, the act generally requires consent
of all parties to the communication.  See
G. L. c. 272, § 99 (prohibiting secret recording without prior
authority by all parties to communication); Hyde, 434 Mass. at 599 (act
requires consent of all parties).  For
this reason, the hospitals are wrong to suggest that they may secretly record
patient communications and then share those communications with third parties;
such recording by the hospitals would be permissible only with the patient's
express or implied knowledge. 

[27] Amici New
England Legal Foundation and Associated Industries of Massachusetts suggest we
construe "communication" to mean "speech," which is how the
act defines "oral communication." 
G. L. c. 272, § 99 B 2.  If the Legislature had intended
"communication" also to mean "speech," it would have used
the same words.  Moreover, if the Legislature
intended "wire communication" to be limited to speech over a wire,
cable, or other like connection, as the amici suggest, it would have said
so.  Its choice instead to use the phrase
"any communication" in the definition of "wire
communication" evinces the Legislature's intent that "wire
communication" be more expansive than "speech" over a wire,
cable, or other like connection.  See,
e.g., Commonwealth v. Williamson, 462 Mass. 676, 682 (2012), quoting Ginther v.
Commissioner of Ins., 427 Mass. 319, 324 (1998) ("Where the Legislature
used different language in different paragraphs of the same statute, it
intended different meanings").

[28] Given the
defined term "contents" in the act, the court is wrong to focus on
whether Vita alleges "her husband's medical records or the contents of his
patient portal were in any way collected, intercepted, and transferred to third
parties."  Ante at
   . 
"Contents," under the act, is clearly not so limited.

[29] An
interception occurs only where a party "secretly hear[s], secretly
record[s], or aid[s] another to secretly hear or secretly record the contents
of any wire or oral communication through the use of any intercepting device by
any person other than a person given prior authority by all parties to such
communication."  G. L.
c. 272, § 99 B 4.  

[30] Notably, the
hospitals disregard that the disclosures further provided that the logged
information will only be used "to prevent security breaches and to ensure
the integrity of the data on our servers" (emphasis added).  Here, Vita alleges that her interactions with
the hospitals were used for advertisement purposes, beyond the scope of the
disclosed use.  See In re Pharmatrak,
Inc., 329 F.3d at 19, quoting Gilday v. DuBois, 124 F.3d 277, 297 (1st Cir.
1997) ("A party may consent to the interception of only part of a
communication or to the interception of only a subset of its communications.
. . . 'Thus, a reviewing court must inquire into the dimensions of the
consent and then ascertain whether the interception exceeded those
boundaries'" [quotation omitted]).

[31] The
hospitals' reliance on our decisions in Rainey, Morris, and Curtatone is
misplaced.  In Rainey and Morris, each
aggrieved party was on notice that the other party to the respective
communication was recording the statement in some manner.  Morris, 492 Mass. at 505-507.  Rainey, 491 Mass. at 643-644.  Similarly, in Curtatone, the aggrieved party
knew that the person with whom he was speaking was recording the
conversation.  Curtatone, 487 Mass. at
655-658.  Here, Vita alleges that she
lacked notice that third parties were intercepting her communications at all.

[32] Moreover, as
alleged in the complaints, even if a user used her browser settings to disable
cookies, the tracking software would continue to record the user's
communications with the hospitals. 

[33] Taking what
appears to be judicial notice of "thousands" of websites that
apparently do not disclose candidly their practice of sharing their tracking of
website users' activities for advertisement purposes, the court states that it
is up to the Legislature to analyze the business realities.  Ante at    .  But the Legislature has demonstrated that when
so-called business realities require a narrow exception to the act, it has
provided the same.  See, e.g., St. 1998,
c. 163, §§ 7, 8 (amending act to exempt financial institutions' recording of
telephone calls "with corporate or institutional trading partners").

[34] The court
also appears to be concerned about the potential criminal liability under the
act, especially for companies unaware of tracking on their websites.  Ante at    .  Of course, the act criminalizes only
"willful[]" recordings. 
G. L. c. 272, § 99 C 1. 

[35] Nor can the
hospitals credibly claim surprise.  At
the least, it would appear that the now two decades old decision in In re
Pharmatrak, Inc., 329 F.3d at 18, might have provided notice.  Indeed, the mishandling of private healthcare
information has garnered the attention of the Federal Trade Commission (FTC),
including some enforcement action prior to the filing of Vita's
complaints.  See, e.g., Matter of Flo Health,
Inc., FTC File No. 1923133 (FTC enforcement action brought in January 2021
involving disclosure of health data to third-party analytics providers).

[36] The argument
of amicus Chamber of Commerce of the United States of America that the tracking
software does not comprise an "intercepting device" ignores that the
software runs on physical infrastructure, which is a "device or apparatus
which is capable of transmitting, receiving, amplifying, or recording a wire or
oral communication."  G. L.
c. 272, § 99 B 3.